The **NATIONAL CITY BANK OF EVANSVILLE**, a Corporation,

v.

**UNITED STATES.**

No. 245-56.

United States Court of Claims.

July 16, 1958.

Edward L. Carey, Washington, D. C., for plaintiff.

Kathryn H. Baldwin, Washington, D. C., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

LARAMORE, Judge.

This case comes before the court on cross-motions for summary judgment.

Plaintiff, as assignee on three defaulted contracts, sues for the alleged unpaid balance due at the time of termination for default, plaintiff's claim being that the defendant could not use any of such balances for completion of the work, since it would in effect be a benefit to the sureties, who had given plaintiff a subrogation agreement.

The facts are summarized as follows: On November 26, 1952, Regent Contracting Company, a co-partnership consisting of Raymond W. Ewell, Henry Tuller, Julie Tuller and Ralph I. Tuller, entered into Contract NOy–74886 with the United States Department of the Navy, Bureau of Yards and Docks, for the construction of an enlisted men's barracks and subsistence building at the United States Naval Air Station, Oceana, Virginia, at a contract price of $2,700,-000, which was subsequently increased to $2,762,089.15. The contractor gave performance and payment bonds in the respective amounts of $2,700,000 and $1,-080,000, on which Seaboard Surety Company, Employers Reinsurance Corporation, Manufacturers Casualty Insurance Company and Pacific National Fire Insurance Company were co-sureties.

Under the terms of the contract the contractor was to commence work on December 1, 1952, and complete the work on December 1, 1953, which latter date was modified to July 14, 1954; and provision was made for the assessment, in accordance with article 11 of the contract, of liquidated damages in the amount of $995 for each calendar day of delay.

Defendant received notice of assignment to plaintiff of all moneys due to become due under said contract, and receipt of said notice, together with an accompanying instrument as assignment, was acknowledged by defendant on December 15, 1952. Thereafter certain progress payments on said contract were made to plaintiff pursuant to said assignment.

On August 26, 1953, said Regent Contracting Company, a co-partnership, entered into Contract NOy–75695 with the United States Department of the Navy, Bureau of Yards and Docks, for the construction of a 10-bed infirmary at the United States Naval Air Station, Oceana, Virginia, at a contract price of $270,000, which was subsequently decreased to $269,853. The contractor gave performance and payment bonds in the respective amounts of $270,000 and $135,000, on which said Pacific National Fire Insurance Company was the surety.

Under the terms of the contracts the contractor was to commence work on September 1, 1953, and complete the work on May 9, 1954, and provision was made for the assessment, in accordance with article 11 of the contract, of liquidated damages in the amount of $100 per each calendar day of delay.

Defendant received notice of assignment to plaintiff of all moneys due or to become due under said contract, and receipt of said notice, together with an accompanying instrument of assignment, was acknowledged by the defendant on October 5, 1953. Thereafter certain progress payments on said contract were

made to plaintiff pursuant to said assignment.

On January 15, 1954, Regent Contracting Company, Inc. entered into Contract NOy–74835 with the United States Department of the Navy, Bureau of Yards and Docks, for the construction of a steam generating plant at the United States Naval Air Station, Oceana, Virginia, at a contract price of $338,000, which was subsequently increased to $350,423. The contractor gave performance and payment bonds in the respective amounts of $338,000 and $169,000, on which American Fidelity Company and The New Hampshire Fire Insurance Company were co-sureties.

Defendant received notice of assignment to plaintiff of all moneys due or to become due under said contract, and receipt of said notice, together with an accompanying instrument of assignment, was acknowledged by defendant on February 17, 1954. Thereafter certain progress payments on said contract were made to plaintiff pursuant to said assignment.

All of the Contracts NOy–74886, NOy–75695, and NOy–74835 contained the following provisions:

"Article 6.—Payment and Release

"(a) The Contractor shall be entitled to partial payments hereunder as the work progresses upon the basis of estimates made by the Contracting Officer of the degree of completion. * * *

"(b) The Contractor may submit monthly, or at more frequent intervals, as approved by the Contracting Officer, to the Officer in Charge an itemized request for partial or final payment as the case may be. The Officer in Charge will recommend for the approval of the Contracting Officer an amount which he believes the Contractor is entitled to be paid. Payment shall be made of the amount approved by the Contracting Officer subject to reduction for overpayments or increase for underpayments on preceding payments to the Contractor. The Contracting Officer may in his discretion reserve or withhold a percentage (not exceeding 10 percent) of each payment hereunder until the completion of the work and acceptance thereof by the Government or until such earlier time as he may determine.

\* \* \* \* \* \*

"(d) The obligation of the Government to make any of the payments required under any of the provisions of this contract (including those of Articles 25 and 26) shall, in the discretion of the Contracting Officer, be subject to (1) any unsettled claims against the Contractor for labor or materials, (2) reasonable deductions on account of defects in material or workmanship, and (3) any claims which the Government may have against the Contractor under or in connection with this contract. Any overpayments to the Contractor shall, unless otherwise adjusted, be repaid to the Government upon demand."

"Article 11.—Liquidated Damages

"(a) If the Contractor fails to complete the work or any part thereof within the time specified in Article 1, or applicable extension thereof, it will be difficult or impossible to ascertain the actual damages for the delay and in lieu thereof the Contractor shall pay to the Government as fixed, agreed, and liquidated damages for each calendar day until the delayed work is completed or accepted, the amount as set forth in the specifications or in Article 1. If, after the expiration of the time specified in Article 1, or applicable extension thereof, the Government terminates the right of the Contractor to proceed and does not elect to complete the work, liquidated damages shall be paid as above provided for each calendar day after the time specified in Article 1, or applicable extension thereof, until the effective

date of the termination of the Contractor's right to proceed. If the Government terminates the right of the Contractor to proceed and elects to complete the work as provided in Article 25, liquidated damages shall, if the Government exercises due diligence in completing the work, be paid as above provided for each day after the time specified in Article 1, or applicable extension thereof, until the delayed work is completed or accepted. The Contractor and his sureties shall be liable for all such liquidated damages accruing as hereinabove provided. * * * The Contracting Officer shall ascertain the facts and the extent of the delay and extend the time for completing the work or any part thereof when in his judgment the findings of fact justify such an extension. The determination of the Contracting Officer shall be final, subject only to appeal under the provisions of Article 16."

## "Article 16.—Disputes

"Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the Secretary, and the decision of the Secretary or his duly authorized representative for the hearing of such appeals shall be final and conclusive; *Provided* That if no such appeal is taken, the decision of the Contracting Officer shall be final and conclusive. * * *"

## "Article 25.—Termination for Default

"(a) The performance of work under this contract may, subject to

the provisions of paragraph (a) of Article 26, be terminated by the Government in accordance with this article in whole, or from time to time in part, whenever the Contractor shall default in performance, or shall so fail to make progress in the prosecution of the work hereunder as, in the opinion of the Contracting Officer, to endanger performance of this contract in accordance with its terms. Termination of work hereunder shall be effected by delivery to the Contractor of a Default Notice of Termination specifying that termination is for default or failure, the extent to which performance of work under this contract shall be terminated, and the date upon which such termination shall become effective.

* * * * * *

"(c) In addition to its other remedies, the Government may, with respect to work terminated as provided in this article, complete such work or any part thereof in such manner and by such means and with such changes therein as it may deem advisable. If the Government elects to complete less than all of such work, or to make changes therein, the contract price (adjusted as of the effective date of termination pursuant to other provisions of this contract) shall for the purpose of this paragraph be further adjusted, in the manner provided in Article 10 in case of a change, to reflect such deletion or changes in the work made after the effective date of termination, and all references hereinafter made in this paragraph (c) to the contract price shall be deemed made to the contract price as so finally adjusted. In effecting the completion of work under this article, the Government may, in addition to all rights otherwise conferred, take possession of and utilize such material, equipment and plant as may be at the site of the work or on order and which the Contracting

Officer may deem necessary or useful in facilitating such completion. Upon completion of such work, or so much thereof as is to be completed, the Contracting Officer shall determine the cost to the Government of such completion, which determination shall be final, subject only to appeal under Article 16. If the cost of such completion, plus all payments otherwise made to the Contractor, exceeds the contract price, the excess cost shall be charged to the Contractor and the Contractor or his surety, if any, shall pay such amount to the Government upon demand. Such amount shall be in addition to the liquidated damages to be paid under Article 11.

\* \* \* \* \* \*

"(e) The obligation of the Government to make any payment under this article: (1) shall be subject to deductions in respect of (i) all unliquidated partial or progress payments, payments on account theretofore made to the Contractor and unliquidated advance payments, and (ii) any claim which the Government may have against the Contractor in connection with this contract (including without limitation any claims under paragraph (c) of this article); (2) in the discretion of the Contracting Officer shall be subject to deduction in respect of the amount of any claim of any subcontractor or supplier whose subcontract or order is related to the performance of this contract; and (3) shall be subject to the condition that payment of that portion of the amount to be paid the Contractor on account of the completion of the part of the work which is not terminated by the Default Notice of Termination shall be made at the times and in the manner provided in Article 6 with respect to partial payments and final payment for the performance of the work."

The contractor entered on performance of each of the aforesaid contracts, but did not complete any of them. On July 22, 1954, defendant terminated each of said contracts, in whole, for default.

The last progress payment made on Contract NOy–75695 was for the period ending June 10, 1954, and the last progress payment made on Contracts NOy–74886 and NOy–74835 was for the period ending June 15, 1954. As of the effective date of termination, *viz.*, July 22, 1954, the accounts of the contractor's estimated earnings and progress payments made were as follows:

"CONTRACT NOy–74886

| | |
|---|---|
| Total estimated amount earned to default date—July 22, 1954 | $2,525,830.34 |
| Less total partial payments | 2,421,938.01 |
| | |
| Estimated balance of earnings, including retained percentages | $103,892.33 |
| Less cost of work to correct deficiencies in work previously performed | 108,100.00 |
| | |
| Difference (credit to Government) | $4,207.67 |

CONTRACT NOy–75695

| | |
|---|---|
| Total estimated amount earned to default date—July 22, 1954 | $180,390.49 |
| Less total partial payments | 145,350.70 |
| | |
| Estimated unpaid earnings, including retained percentages | $35,039.79 |

CONTRACT NOy–74835

| | |
|---|---|
| Total estimated amount earned to default date—July 24, 1954 | $119,452.60 |
| Less partial payments | 95,339.34 |
| | |
| Estimated unpaid earnings, including retained percentages | $24,113.26" |

On July 21, 1954, plaintiff demanded all moneys remaining on Contract NOy–74886, irrespective of who completed the work, on the basis of an alleged subrogation agreement between plaintiff bank and the sureties on the contract. Defendant at that time advised that it was not possible to determine whether any sums would be due until completion of the work.

Plaintiff then protested the use by the Government of unexpended funds for the completion of the contracts, and by letter made demand upon the General Accounting Office for alleged earned unpaid amounts on each of said contracts to date of default.

Plaintiff then was advised that the Government was using the unexpended

funds for completion of the defaulted contract and its claim was denied to the extent that such balances were necessary to defray excess completion costs.

Subsequently, after the sureties declined to complete, defendant let three contracts to J. L. Coe Construction Company, Inc. for completion of each of the defaulted contracts. The balance of the funds available on said defaulted contracts was used by the Government in payments on the completion contracts.

This suit followed—plaintiff alleging, in effect, that the Government's use of the unexpended contract funds for completion of the defaulted contracts, inured to the benefit of the sureties, who were obligated to pay excess costs, and that plaintiff had a superior right to such funds because of an alleged subrogation agreement between it and the sureties.

Between June 22 and June 26, 1956, final payments were made by the United States on each of said completion contracts.

In each instance the cost of completing the work was in excess of the unexpended funds under the terminated contracts.

On December 18, 1956, defendant filed its answer to the petition, together with its counterclaim against plaintiff for the amount of said excess costs and liquidated damages, on the ground that plaintiff, in receiving progress payments for and on behalf of the contractors, had been overpaid in these amounts.

Also, on December 18, 1956, defendant filed its motion for summons and its cross-claims against Regent Contracting Company, a co-partnership, Henry Tuller, Julie Tuller, Ralph I. Tuller and Raymond W. Ewell, co-partners doing business as Regent Contracting Company, and Regent Contracting Company, Inc., for the aforesaid excess costs and liquidated damages for delay on said defaulted contracts. Defendant's motion was allowed on January 4, 1957.

All of said third parties were served, with the exception of Regent Contracting Company, a co-partnership, which could not be found. None of said third parties has made any appearance in this action, with the exception of Raymond W. Ewell, who, on April 22, 1957, filed an answer to defendant's claim, and who also on the same date filed an attempted cross-claim against the other third parties, Ralph I. Tuller, Henry Tuller and Julie Tuller.

At the time of the filing of its answer and the aforesaid motion for summons and its claims, defendant also moved the court for notice to the sureties, Pacific National Fire Insurance Company, Seaboard Surety Company, Employers Reinsurance Corporation, Manufacturers Casualty Insurance Company, American Fidelity Company, and The New Hampshire Fire Insurance Company. Defendant's motion was granted, and notices to appear pursuant to 41 U.S.C.A. § 114 (b) were served on each of said sureties. On March 25, 1957, American Fidelity Company and The New Hampshire Fire Insurance Company filed an answer to plaintiff's petition with respect to Contract NOy–74835. The four sureties on Contracts NOy–74886 and NOy–75695 moved to quash the notices to appear, and after denial of their motion, filed notice of appearance herein.

Interim some of the foregoing procedures, and on or about January 21, 1957, defendant received from the sureties on Contract NOy–74835 the sum of $5,916.34, covering excess costs assessed on said contract. No liquidated damages for delay were assessed on this contract. And on or about March 7, 1957, defendant received from the sureties on Contracts NOy–74886 and NOy–75695 the full amount of the excess costs and liquidated damages as assessed on these contracts in the total sum of $227,356.56.

The plaintiff apparently is claiming a paramount right to unexpended funds because as assignee it entered into a subrogation agreement with the sureties. However, the only question here is: did the Government have a right to apply all earned and unearned contract moneys

in its hands at the time of default to the completion contracts?

■ It is well established that an assignee stands in the shoes of the assignor, and that by assignment the assignee could acquire no greater rights than its assignor. Modern Industrial Bank v. United States, 101 Ct.Cl. 808. Therefore, if the Government could use the unexpended funds to complete the defaulted contract, absent assignment, certainly the assignment could not create a bar.

That the United States had a right to enter into completion contracts in the event of default is so crystal clear that no discussion seems necessary. Article 25 of the contract, entitled "Termination for Default" provides for termination and provides further that "In addition to its other remedies, the Government may, with respect to work terminated as provided in this Article, complete such work or any part thereof in such manner and by such means * * * as it may deem advisable." Article 25 provides further that "if the cost of such completion, plus all payments otherwise made to the contractor exceeds the contract price, the excess cost shall be charged to the contractor and the contractor or his surety, if any, shall pay such amount to the Government upon demand."

■ The situation here was this—the contractor defaulted; the surety refused to complete; the Government contracted for completion and suffered excess costs. As far as possible, the unexpended money under the contracts was used to pay for completion costs.

Under the terms of the performance bonds there was no obligation for the sureties to complete the contracts, and the sureties declined to do so. The situation then was that the Government was forced to complete. Obviously the Government was fully within its rights in using the unexpended funds for completion of these contracts. Modern Industrial Bank v. United States, supra; Hardin County Savings Bank v. United States, 65 F.Supp. 1017, 106 Ct.Cl. 577.

Nor is the subrogation agreement between plaintiff and the sureties a bar to the use of such moneys. The United States was not a party to such agreement. Upon default of the contractors the Government used the money to complete the contracts, as it had a right to do. The United States paid no money to the sureties and if the sureties indirectly benefited by the action of the United States in completing the contracts, it is immaterial to this issue. If through the proper handling of such funds by the United States the sureties indirectly became the recipient of benefits to which, as against plaintiff, they are not entitled, plaintiff's action is against them and not the United States.

■ It is well established that the jurisdiction of this court extends only to claims against the United States,[1] and obviously a controversy between private parties could not be entertained.[2]

Plaintiff has no valid claim against the United States to moneys expended by the United States in completion of the defaulted contracts. Accordingly, defendant's motion for summary judgment is granted, plaintiff's cross-motion is denied, and the petition is dismissed.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.

1. United States v. Sherwood, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058.

2. Beddo v. United States, 28 Ct.Cl. 69.