Durfee, Judge,
delivered the opinion of the court:
This is an appeal from an award and judgment of the Indian Claims Commission entered June 18,1962 which granted a net award of $2,034,889.15 to the Red Lake and Pembina Bands of Indians after deducting prior payments of $635,774.87 and gratuity offsets in the amount of $699,061.57.[1]
The lands involved lie in the Red River Valley of the North, are located partially in North Dakota and partially in Minnesota, and are known as Royce Area 445 Minnesota 1, North Dakota 1. The Red Lake and Pembina Bands ceded *393 the lands to the United States by Treaty, October 2,1863 (13 Stat. 667, Proclaimed May 5,1864).
Since the land involved was the subject of claims by other parties, it was stipulated below that the Turtle Mountain and Little Shell Bands of Chippewa were constituent parts of the Pembina Band which executed the 1863 Treaty.
1. We will first deal with appellants’ claim of ownership of the Sheyenne-Goose area. The Commission found that the appellant bands did not own Indian title to the 2,311,660 acres lying west of the Ned Niver of the North between the Goose and the Sheyenne Eivers in 1863. Appellants contend that the Commission erred as a matter of law in holding against the Treaty, which explicitly included the disputed area, since substantial and compelling evidence was present to sustain the treaty boundary. But the Commission must rely on all available materials and aid it can muster. It j need not consider any one piece of evidence conclusive, even f if that piece of evidence be the Treaty of cession. If the ¡ finding of the Commission is supported by substantial evi- ¿ dence, it must stand. Miami Tribe of Oklahoma v. United States, 150 Ct. Cl. 725; 281, F. 2d 202 (1960), cert. denied, 366 U.S. 924.
To establish Indian title appellants must establish ex- \ elusive occupation of the lands in question. Substantial \ evidence was introduced to disprove exclusive occupation and control over the Sheyenne-Goose tract. The Sisseton and Wahpeton Indians, autonomous bands of Sioux, ceded this same tract of land to the United States by Treaty of February 19, 1867 (15 Stat. 505) followed by the Agreement of June 22,1874 (18 Stat. 167). But the mere cession treaty was > not sufficient to establish Indian title when compensation for) the land was claimed by the Sioux in this court. The Sisseton and Wahpeton Bands of Sioux Indians v. United States, 58 Ct. Cl. 302 (1923), aff'd 277 U.S. 424. In answer to the argument there raised that the Government, in negotiating the Treaty, recognized Indian title and was estopped from denying such title, the court said:
* * * it may well be that the motive which prompted such generous conduct [inclusion of the tract in the Treaty] was more in the interest of composing hostility *394 to be feared from the Indians without so acting, (at 328).
Clearly, the court rejected the argument similar to the one here raised that the lands described in the Treaty were conclusively the property of the ceding Indians.
Further, the failure of the Sioux to make claim for the disputed territory during the negotiations of the 1863 Treaty is understandable. The Sioux were hard pressed with other matters in that year.[2]
We reject appellants’ contention that the Commission’s weighting of the 1863 Treaty was error as a matter of law and hold, after a consideration of the evidence, that the Commission’s conclusion that appellants did not possess Indian title to the disputed tract is supported by substantial evidence.
2. The Commission found that the average per acre value of the remaining 7,488,280 acres was 45 cents in 1863. It ruled that the Treaty consideration of eight cents an acre was unconscionable and granted a gross award of $3,369,-726.00, which sum less the $609,480.36 already paid on the claim, left a balance of $2,760,245.64. This balance was held to be subj ect to further credits and offsets.
Appellants here assert that the 45 cents per acre value found by the Commission is contrary to the evidence. But while the test of valuation is “fair market value” used in the sense of “what it fairly may be believed that a purchaser in fair market conditions would have given for it * * *” N.Y. v. Sage 239 U.S. 57, 61 (1915), there were few if any willing buyers for these lands in 1863. Absent evidence of actual market conditions, we pointed out in Otoe and Missouria Tribe of Indians v. United States, 131 Ct. Cl. 593, 131 F. Supp. 265 (1955), cert. denied, 350 U.S. 848, that other conditions, such as economic resources either actual or potential, record sales of neighboring lands, markets and transportation, should be considered. The Commission took these factors into account. It examined the three approaches taken by Mr. Davis, plaintiffs’ expert witness, and extracted from his reports much useful data. The Commission also *395 considered the testimony of defendant’s witnesses. Accepting neither party’s witnesses as being the last word, the Commission extrapolated from all the valuation evidence before it and concluded that the average per acre value of the 7,488,280 acre tract was 45 cents. The Commission in so doing did not wholly disagree with evidence presented by appellants to the effect that some of the acreage was more valuable; nor did the Commission wholly disagree with ap-pellee’s evidence that some of the acreage was of considerably less worth. After consideration of the entire record, we conclude that the Commission’s finding on value was supported by substantial evidence.
. 3. The third issue raised in this appeal is whether the Commission was correct in offsetting gratuities in the amount of $699,061.57 against the award.
a. Appellants first contend that the Commission was outside its jurisdiction in allowing an offset in any amount. The pertinent part of the statute, Section 2 of the Indian Claims Commission Act (25 U.S.C. § 70a) reads:
_ * * * the Commission may also inquire into and consider all money or property given to or funds expended gratuitously for the benefit of the claimant and if it finds that the nature of the dawn and the entire course of dealings and accounts between the United States and the claimant in good conscience warrants such action, may set off all or part of such expenditures against any award made to the claimant * * *. [Emphasis supplied.]
Appellants read the if clause (the portion emphasized) as requiring the Commission to make explicit affirmative findings. Such a construction is too strained. We do not think it necessary that the Commission make such specific findings; an implicit finding to that effect is sufficient, and was.here present.
After quoting sec. 2 of the Act, supra, the Commission in its opinion, 9 Ind. Cl. Com. 457 at 514, stated:
In our findings of Fact No. 58 through 65 we have applied these provisions of the Indian Claims Commission Act and made our determinations as to which of the numerous disbursements set forth by the defendant may properly be offset. [Emphasis supplied.]
*396 The Commission, in considering the allowability of claimed offsets, has measured each item against the following requirements:
(4) Does the nature of the claim and does the course of dealings between the petitioner and the United States in good conscience warrant the offset, (id at 517)
Clearly, the Commission did consider the if clause of section 2. As we stated in Sioux Tribe of Indians of the Lower Brule Reservation v. United States, 161 Ct. Cl. 413, 417, 315 F. 2d 378, 380, cert. denied, 375 U.S. 825:
* * * Nor do we think the Commission was required to set out in detail the entire course of dealing between the tribe and the United States to support its finding that the offset was allowable. That would require voluminous findings in each case in which an offset was claimed. The Commission was merely directed to take them into consideration in determining whether in good conscience the offset should be allowed. * * * [Emphasis supplied.]
The Commission did so here.
b. Appellants next contend that under the circumstances of this case, no deduction of gifts from the award is allowed by the Indian Claims Commission Act. Appellants argue that a gratuity is a gift and that by later deducting the cost of the gift from the award, the Government in effect becomes an “Indian Giver.” Appellants maintain that this was not the intent of Congress. We are referred to proceedings both in the House of Representatives and in the Senate. Nevertheless, under the Act, “gratuities” can be deducted from awards. Congress so enacted the law, and we can hardly say that in creating and vesting in the Indians a right to relief, Congress could not impose conditions and limits on the award of that relief. Cf. Duwamish et al. Indians v. United States, 79 Ct. Cl. 530, 611 (1934) cert. denied, 295 U.S. 755, dealing with an earlier jurisdictional act.
c. Appellants next argue that the Commission erroneously offset expenditures which were not made for the benefit of the claimants. Of the $699,061.57 offset by the Commission, $341,610.47 was for goods and services while the remaining $357,451.10 was for land. In discussing the amount attributable to goods and services, we must deal with appellants’ *397 contention that none of the goods or services were ever given to the claimants or the members of the claimants. The core of appellants’ argument is that the goods were not delivered to the tribal entities but to members of the tribes; that the members receiving the goods were actually receiving pay for labor.[3] But an analysis of the record does not support appellants’ position. The offsets allowed by the Commission did reflect gratuities expended for the benefit of the claimants as entities. For example, the only offset allowed under the Commission’s finding 58 was a $1,200 item for hunting and fishing equipment. Some $29,000 in claimed offsets were disallowed by the Commission in that same finding. The items disallowed were planting and harvesting costs, expenses of Indian delegations, household equipment and supplies, feed and care of livestock, purchase of livestock, provisions, and miscellaneous transportation costs. The reasons for not allowing these items were variously that they reflected agency expenses; were of non-tribal benefit; were not gratuities; or were individual gifts. The item allowed reflected three $400 appropriations from 1877 through ’79 for the purchase of gilling twine used in fabricating fishing nets.- The Commission properly found this amount to be offsettable. To say that the tribal entities would not receive benefit from such a gratuity is to disregard the nature of the tribal relationship. After reviewing all the Commission’s findings dealing with the goods and services offsets, we must acknowledge that due consideration was taken of all circumstances surrounding each and every item claimed. The results are sound.
Appellants next contend that no proof has been offered to establish that these items were actually ever received by the tribes. The Government used some of the goods to support its on-reservation installations; some goods were returned to sellers for credit; and some Indians paid for goods through labor. Appellants contend consequently that the Commission’s indulgence in the presumption that the goods and services appropriated for the claimants was invalid and erroneous. But we pointed out above that the Commission *398 disallowed claimed offsets which related to agency expenses, gifts to individual Indians or compensation for services rendered. The offsets allowed did conform to the test enunciated by claimants themselves when they stated (at 46 of their brief):
The test is in the nature of the goods and what happened to the goods. (Emphasis original.)
Appellants’ final contention in regard to the offset of goods and services is that no delivery of the allowed items was ever actually proven. We think that the available records offered by the Government were at least enough to shift any burden of proof to claimants. The available records do indicate that the goods were received by the Indians in due course, and claimants must overcome that evidence before we could assume that the goods were never in fact delivered.
The next order of business is a consideration of claimants’ contention concerning the offsets attributable to land purchases. Three different expenditures were offset. Claimants concede that $6,11&.71 representing the purchase of land for the Red Lake Band can properly be offset against the Red Lake Band share of an award. The two items calling for our attention are the purchase of a township of land for the Pembina Band which gave rise to the offset claim of $27,022.27, and the $324,310.12 offset against the purchase of additional lands near the Turtle Mountain Reservation.
As to the $27,022.27 item, claimants contend that no evidence presented by appellee was sufficient to overcome the absence of a recorded muniment of title in the Band. But we think the evidence presented — the authorization and appropriation, Act of March 3, 1873, 17 Stat. 530, 539, the 1873 Annual Report of the Commissioner of Indian Affairs, the 1874 appropriation for removal and resettlement costs — was sufficient to prove the expenditure of the gratuity. Other evidence tended to prove that the Pembina Band benefited from the land purchase. Failure to show recorded muniment of title is not sufficient to negate this evidence.
The purchase of the lands adjacent to the Turtle Mountain Reservation was not for the benefit of the Turtle Mountain Band, claim appellants, but was for the benefit of the “Indians of the Turtle Mountain Reservation” as specified in *399 the title of the 1940 Act (54 Stat. 219). Appellants contend that the Commission actually fornid the Turtle Mountain Band to be a different entity from the “Indians of the Turtle Mountain Beservation.” But the finding merely points out that of the 12,277 on the census roll, only 9,800 enrolled as members of the tribe.
To jump from this finding to the conclusion appellants urge, would be to read only the title of the 1940 Act. But section 2 of that Act defines the beneficiaries to include “(2) all unenrolled Indians who are members of the band or bands which constituted the Turtle Mountain Tribe * * The Act was designed to and did benefit the Turtle Mountain Band. The offset was proper. Both this item and the $27,022.27 item discussed above may be offset against the Pembina Band’s share of the award.
4. The last problem we face is the issue of distribution. It has now been established, and is conceded by appellee, that the award must go to the tribal entities rather than descendants of the bands. Minnesota Chippewa Tribe v. United States, 161 Ct. Cl. 258, 315 F. 2d 906 (1963); and Spokane Tribe et al. v. United States, 163 Ct. Cl. 58 (1963). But the issue whether a division of the award between the Pembina and Bed Lake Bands should be made remains before us. The 1863 Treaty (by Supplementary Articles, proclaimed April 25, 1864, 13 Stat. 689) did set forth consideration that was divided between the 'bands as follows — two-thirds for the Bed Lake Band and one-third for the Pembina. This division was in accord with the respective populations of the bands at that time. To say that Congress intended the consideration be divided equally between the bands is to ignore the clear import of the only language in the Treaty dealing with the subject. Since the consideration for the cession of territory was to be so divided between the two bands, the award now given to remedy the insufficiency of the original consideration must likewise be divided. And the allowed offsets attributable specifically to one band or the other should be deducted from the band’s share of the award. Allowed offsets that relate to expenditures made for the benefit of both bands should be deducted before the division is made.
*400 The determination and findings of the Indian Claims Commission are therefore affirmed in part and reversed in part, and the case is remanded to the Commission for further proceedings in accord with this decision.

 Appeal Is from Docket 18-A. See findings of fact and opinions of Commission. 6 Ind. Cl. Com. 247; 9 Ind. Cl. Com. 315, 457.

 The Sioux were fleeing from or surrendering to the Cavalry after an 1862 massacre.

 Congress required able-bodied Indians to perform labor as a condition precedent to receipt of goods; and prohibited delivery to the bands or the chiefs. (Act of Mar. 3, 1875, 18 Stat. 448, 25 U.S.C. 133, 137.)