The **CHEROKEE NATION**, and its attorneys, Paul M. Niebell, Earl Boyd Pierce, George E. Norvell, and Dennis W. Bushyhead

v.

The **UNITED STATES.**

No. 6-64.

United States Court of Claims.
Jan. 21, 1966.

---

946

Paul M. Niebell, Washington, D.C., attorney of record, for appellants.

Jay H. Hoag, Duluth, Minn., filed a brief for Jay H. Hoag and his Associates, amici curiae, Marvin J. Sonosky, Sonosky & White, Washington, D. C., of counsel.

Jess Larson, Washington, D.C., filed a brief for Warren Watkins, Claremore, Okl., amicus curiae, Larson & Greene, Washington, D.C., of counsel.

Jesse L. Ballard, Tulsa, Okl., filed a brief on behalf of The Executive Committee of the Cherokee Nation, amicus curiae.

Wilkinson, Cragun & Barker, Washington, D.C., filed a brief, amici curiae.

Ralph A. Barney, Washington, D.C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for appellee.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

DURFEE, Judge.

The Cherokee Nation and its attorneys appeal from a final order of the Indian Claims Commission awarding an attorneys' fee of $1,000,000, or 6.96 percent of the final net judgment of $13,364,476.15, a reduction of $336,447.61 from the ten percent contingent fee specified in the contract between the Cherokee Nation and its attorneys.

The Government first urges that the court is without jurisdiction as a matter of law to review the determination of the Commission as to the amount of attorneys' fees. Specifically, the Government argues "that the appellate jurisdiction of this court is limited to a review of decision of the Commission as to the merits of the claim against the United States by an Indian tribe."

The Court of Claims obtains its right of appellate review over the decisions of the Indian Claims Commission under section 20 of the Indian Claims Commission Act of August 13, 1946, 60 Stat. 1054, 25 U.S.C. § 70s (1958 ed.). Subsection (b) authorizes an appeal to this court from "the final determination" of the Commission.

This court has just issued a decision on December 17, 1965 that is dispositive of this contention; Red Lake and Pembina Bands et al., Ct.Cl., 355 F.2d 936, an appeal from a decision of the Indian Claims Commission in consolidated Docket Nos. 18-A, 113 and 191; 13 Ind.Cl. Com. 574. One of the grounds for appeal by the *Red Lake and Pembina Bands* and their attorneys was that part of the fee order of the Commission which included the lawyers for the Little Shell and Turtle Mountain Bands in the listing of counsel entitled to share in the attorneys' award allowable to the Pembina Band. The Government also moved to dismiss this appeal on the ground that the court had no jurisdiction over the dispute as to attorneys' fees.

The present dispute does not involve this identical question as to whether an attorney applying for a fee has performed *any* services "in prosecuting the claim in question" under section 15 of the Indian Claims Commission Act.

■ However, the issue in the present appeal as to the *amount* of attorneys' fees raises the same basic jurisdictional question, *viz.*, Was the order of the Commission fixing the attorneys' fees a "final determination" of the Commission under section 20(b) of the Act? Certainly, if the decision of the Commission in *Red Lake and Pembina Bands*, supra, as to the statutory entitlement of an attorney to any fees or consideration at all is a "final determination", it can hardly be argued that the Commission decision finally fixing the total amount of attorneys' fees in the present case is not likewise a "final determination" under the Act.

In the *Red Lake and Pembina Bands et al.* opinion, supra, written for the court by Judge Davis, we had this to say about the same jurisdictional objection:

Since this issue of statutory entitlement was within the Commission's province, this court likewise has jurisdiction to delve into it. Section 20(b) of the Claims Commission Act, 25 U.S.C. § 70s(b), gives the court jurisdiction to review any "final determination" of the Commission, as well as certain interlocutory determinations of liability. The United States argues that the only final determinations subject to review are those deciding the merits of an Indian entity's claim. But the Act does not say so in terms, and we know of no reason why the phrase "final determination" should be so restricted, or should be given less than its full meaning. The Act nowhere suggests that certain areas of Commission decision are to be left without appellate review and guidance; on the contrary, section 20(a) broadly empowers the Commission to certify to this court "any definite and distinct questions of law concerning which instructions are desired for the

proper disposition of the claim."
Nor does the legislative history intimate that this court's power to review should cover fewer subjects than the Commission's power to decide. And from the beginning the practice of the court has been to consider issues of all types which the Commission has resolved in the course of a proceeding (if the requisite finality has been present). * * *1 [355 F.2d p. 939]

Judgment in the present case on the merits of the claim in the net sum of $14,789,476.15, less offsets, was entered by the Commission on April 3, 1961; the final order approving settlement of offsets was entered August 8, 1963, and the formal Findings, Opinion and final Order fixing attorneys' fees was dated March 24, 1964. (An earlier order had allowed $200,000 for interim attorneys' fees). Upon the entry of this final order fixing attorneys' fees, nothing was left to be done. What we have just said in *Red Lake and Pembina Bands et al.*, supra, is equally applicable in the present case:

We have no doubt, moreover, that the Commission's fee-award in this case has the requisite finality. Special findings of fact were rendered on attorneys' fees, as was a final order allowing them compensation. On that subject nothing was left for further consideration; and the fee-award was severed and severable from the judgment on the merits for

the Pembinas. The disposition of this fee-matter was as final as a Commission order definitely denying intervention which this court has held sufficiently conclusive for appeal. Prairie Band of Potawatomi Indians v. United States, 165 F.Supp. 139, 141–142, 143 Ct.Cl. 131, 133–135 (1958); cert. denied, 359 U.S. 908, 79 S.Ct. 587, 3 L.Ed.2d 574 (1959). Similarly, the fee-order was final under the comparable standards of 28 U.S.C. § 1291 (review by courts of appeals of "final decisions" of district courts) and 28 U.S.C. § 1257 (review by Supreme Court of "final judgments or decrees" of state courts). See *e. g.*, Cohen v. Beneficial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949); Baltimore Contractors v. Bodinger, 348 U.S. 176, 75 S.Ct. 249, 99 L.Ed. 233 (1955); Local 438, Const'r Union v. Curry, 371 U.S. 542, 83 S.Ct. 531, 9 L.Ed.2d 514 (1963); Brady v. State of Maryland, 373 U.S. 83, 85, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). [355 F.2d p. 940]

As a further jurisdictional objection, the Government contends that while the amount allowed is a matter in which the United States has an interest, the claim is not one against the United States. Therefore, appellee contends, any effort to increase the Commission's award of attorneys' fees would be a claim against the tribe and not the United States, and not within the jurisdiction of this court, cit-

1. See Chickasaw Nation v. United States, 121 Ct.Cl. 41, 47 (1951) (attorneys' fees); Seneca Nation v. United States, 122 Ct.Cl. 163 (1952) (prosecution of claim by individual member of tribe); McGhee v. Creek Nation and United States, 122 Ct.Cl. 380 (1952); cert. denied, 344 U.S. 856, 73 S.Ct. 91, 97 L.Ed. 665 (intervention); Delaware Tribe of Indians v. United States, 128 F.Supp. 391, 398, 130 Ct.Cl. 782, 794 (1955) (which entity can prosecute claim); Prairie Band of Potawatomi Indians v. United States, 165 F.Supp. 139, 143 Ct. Cl. 131 (1958); cert. denied, 359 U.S. 908, 79 S.Ct. 587, 3 L.Ed.2d 574 (1959) (intervention); Blackfeet and Gros Ventre Tribes v. United States, 162 Ct.Cl.

136 (1963) (intervention); Red Lake, Pembina and White Earth Bands v. United States, 164 Ct.Cl. 389 (1964) (division of award and to whom award should be made). Cherokee Freedmen v. United States, 161 Ct.Cl. 787 (1963) (whether a claim is individual or tribal); Peoria Tribe v. United States, 169 Ct.Cl. 1009 (1965) (to whom award should be made); Minnesota Chippewa Tribe v. United States, 315 F.2d 906, 161 Ct.Cl. 258 (1963) (same); Spokane Tribe v. United States, 163 Ct.Cl. 58 (1963) (same); Absentee Shawnee Tribe v. United States, 165 Ct.Cl. 510 (1964) (whether a claim is individual or tribal; representation of tribe by a constituent part).

ing United States v. Sherwood, 312 U.S. 584, 588, 61 S.Ct. 767, 85 L.Ed. 1058 (1941); National City Bank of Evansville v. United States, 163 F.Supp. 846, 143 Ct.Cl. 154 (1958); and in Berkeley v. United States, 276 F.2d 9, 149 Ct.Cl. 549 (1960). However, these cases deal with the general jurisdictional power of this court to enter money judgments against the United States, and not with the specific jurisdictional power of the court to review final determinations of the Commission and where required, remand thereto with appropriate directions.

■ We note that in referring to the trust fund of $14,789,476.15 for the Cherokee Nation, resulting from the final determination of the Commission on the total award, the Government later contends:

"While it is entirely proper to charge that fund with a proper fee and the legitimate expenses for securing the fund, it is the duty of the Commission, *or the Court in a proper case,* to protect that trust fund to the extent that fees and expenses are reasonable. * * *" [Emphasis supplied.]

Here, the Cherokee Nation is an appellant, and has joined its attorneys as a party to this appeal from the final determination of the Commission on attorneys' fees, because of the alleged failure of the Commission to follow the directive in section 15 of the Act, supra.

Accordingly, we first conclude that this court has jurisdiction as a matter of law to review the final determination of the Indian Claims Commission as to the amount of the attorneys' fees in the present case.

A second question arises from the position of the Government that the attorney appellants, by accepting the fee-award of $1,000,000.00 fixed by the Commission, are now estopped to appeal in an effort to increase the award.

■■ It is the general rule that a party cannot accept the benefits of a judgment, order or decree and afterwards prosecute an appeal or writ of error to

review. (See 4 C.J.S. Appeal and Error § 215a). This general rule applies only where a substantial benefit has been accepted and where the acceptance has been voluntary, and intentional. (See 4 C.J.S. Appeal and Error § 215b). There is substantial evidence to lead us to conclude that the attorneys accepted the fee-award by the Commission under circumstances of strong compulsion and financial duress.

Appellants allege without dispute that during this long period of 16 years of litigation:

Two of the original attorneys had died, and the heirs of one of them were pressing the attorneys for payment of the amount due them; one of the surviving attorneys had had two severe heart attacks, and has since had another one; another attorney had had a serious illness; another contract attorney was in difficult financial straits, having invested his life savings and had borrowed considerable additional amounts, and had experienced the loss of his regular clientele and the income therefrom in carrying on his duties in this case; and all the surviving attorneys were burdened with loans, from which the partial fee allowed on March 12, 1963 brought some temporary relief. The attorneys were paying interest of at least 6 per cent on these loans, while the Cherokee Nation had been collecting 4 per cent interest on the money due the attorneys as attorney fee, from October 8, 1961 (over $90,000.00). * * *

The applicable principle of law is succinctly stated in 4 Am.Jur.2d, sec. 251, p. 747:

If one who accepts the benefits of a judgment or decree does so under compulsion rather than voluntarily, he incurs no waiver.

See also 4 C.J.S. Appeal and Error § 215b; Miller v. Lobdell, 109 Cal.App. 2d 628, 241 P.2d 30 (1952); Greenspot Desert Inns, Inc. v. Roy et al., 63 Cal.

App.2d 54, 146 P.2d 39 (1944). Waiver consists of a *voluntary* and intentional relinquishment of a known right. Pacific States Corp. v. Hall, 166 F.2d 668 (9th Cir. 1948); Riteway Carriers, Inc. v. Stuyvesant Ins. Co., 213 F.2d 576 (8th Cir. 1954); Upper Columbus River Towing Co. v. Maryland Casualty Co., 313 F.2d 702 (9th Cir. 1963).

Following the Commission's fee-award and the acceptance of its payment by the attorneys, the Cherokee Nation, by resolutions of its Executive Committee, dated June 15, 1964, authorized and directed that the tribe appeal on its own behalf, and that its attorneys appeal on their own behalf. As an appellant, the tribe joins with its attorneys in insisting that the full ten percent contingent fee be paid from the proceeds of the judgment in its favor that are now on deposit in its name in the United States Treasury.

■ In the cases relied upon by the appellee as authority for estoppel of attorneys by acceptance of the fee-award, the moving party who asserted this defense in these cases was the client. Smith v. Morris et al. 69 F.2d 3 (3rd Cir. 1934); Wilson v. Pantasote Co., 254 F.2d 700 (2d Cir. 1958). In the present case, the client is the Cherokee Nation, and it has not asserted the defense of waiver or estoppel. On the contrary, the client here is an appellant who insists that its attorneys be paid the full ten percent. We conclude that the Cherokee Nation, and its attorneys, are not estopped from the right to appeal from the fee-award of the Commission because the attorneys accepted payment of the award.

The Commission's opinion stated that the original undertaking which was the basis for the attorneys' claim for the full ten percent contingent fee was champertous, against public policy and void. Although the Government has argued that the Commission was correct in refusing to be bound by the flat ten percent attorneys' fee agreement, neither it nor any other party to this case has raised the issue of champerty. We note that although the attorneys for the tribe urged a flat ten percent fee pursuant to their original contract, they expressly waived any claim for their expenses, to which they are entitled under sec. 15 of the Act. As noted in the able dissent of Commissioner Scott, "The contract attorneys have not petitioned the Commission for any more than the permissible ten percent. The inference, therefore, in the majority opinion that their (appellant attorneys) failure to file for reimbursable expenses is somewhat in the nature of a trade or deal, is, in my opinion, prejudicial." We incline to the view also expressed in the dissent that "since no claim is made for reimbursable expenses, and none will be, the long and tedious recital in the majority opinion is irrelevant and immaterial."

Nevertheless, over half of the majority opinion was devoted to the contract negotiations and the allegedly champertous nature of the contract which resulted therefrom. Because of this extensive intrusion of champerty into the case by the Commission, and the grave implications it entails for the appellant attorneys as members of reputedly good standing in the Bar, and because the case must be remanded for further proceedings entirely apart from the issue of champerty, we believe that this issue should be fully dealt with now.

Canon 42 of the American Bar Association, Canon of Professional Ethics, defines champerty as it concerns members of the Bar:

"A lawyer may not properly agree with a client that the lawyer shall pay or bear the expenses of litigation; he may in good faith advance expenses as a matter of convenience, but subject to reimbursement." [2]

In Wardman v. Leopold, 66 App.D.C. 111, 85 F.2d 277, 106 A.L.R. 1487 (1936), the contingent fee contract for payment of tax specialists on a claim for refund

---

**2.** See also 14 Am.Jur.2d Champerty, § 4, p. 845. A contract for a contingent fee by which an attorney agrees to save his client harmless from costs and expenses of proposed litigation is void.

of income taxes provided "[w]e are to incur all expenses without reimbursement from you. In the event we are unsuccessful, you are to pay us nothing, either in the way of a fee or expenses." In deciding that this contract was not champertous, the Court said, at 85 F.2d p. 279:

> There is a well-defined distinction between contracts for bringing suit in court, where the compensation of the attorney is to be derived from the amount recovered, and in the event of defeat he is to be without any compensation whatever, and contracts where the claim is sought to be recovered against the government or agencies of the government.

>  \*      \*      \*      \*      \*      \*

and at 85 F.2d pp. 279 and 280:

> The distinction between an action before the Commissioner of Internal Revenue and the Board of Tax Appeals to recover a tax unlawfully collected, and a suit at law in the proper court, is apparent from the decision of the Supreme Court of the United States in the case of Old Colony Trust Co. v. Commissioner of Internal Revenue, 279 U.S. 716, 725, 49 S.Ct. 499, 502, 73 L.Ed. 918, where, in sustaining the jurisdiction of the Circuit Courts of Appeals and of the Court of Appeals of the District of Columbia to entertain appeals from the Board of Tax Appeals, the court said: "The Board of Tax Appeals is not a court. It is an executive or administrative board, upon the decision of which the parties are given an opportunity to base a petition for review to the courts after the administrative inquiry of the Board has been had and decided."

> We think it clearly appears that the contract here is not one to conduct litigation in the courts in the ordinary sense, but to recover a claim from the government, and therefore comes within the rule that such contracts are not champertous.

Under the standard form of retainer prescribed by the Department of the Interior and adopted in the two contingent fee contracts that were approved by the Department, it was provided that the attorneys shall be reimbursed for their actual expenses in connection with the litigation, *only from the amount of any judgment recovered.* On October 25, 1946 the American Bar Association submitted an opinion cited in the dissenting opinion of the Commission in this case, which concluded:

> Pursuant to the Act of Congress, the Department of the Interior has created a situation in which a desirable professional service can be performed by members of the bar only by what is possibly a violation of Canon 42 in a situation apparently not contemplated by the Canon.

> This question having been considered at the meeting of the Committee today, I am instructed to advise you that all members of the Committee are clear that the Committee would not entertain any complaint for discipline of a member of the American Bar Association who, in good faith, followed the procedures prescribed by the Act of Congress and the Regulations in connection with the representation of these Indian tribes.

The *original understanding* between the tribe and their attorneys which was the basis of their eventual claim, provided for a flat ten percent contingent fee with the attorneys to absorb their own costs and expenses. Speaking of this "original understanding," the Commission stated:

> Thus this section lays down certain requirements, none of which were complied with by the Cherokee Tribe or its attorneys in this case in the "original understanding" which the tribe has requested us to follow. So it is inevitable that the "understanding" was void from the beginning on two grounds, (1) it was champertous, and therefore against public policy, and (2) it did not comply with said Sec. 81, supra.

When it was offered to the Secretary of the Interior as an amendment to the attorneys' contract of 1958, it was in writing and apparently met the requirements of Sec. 81 except that it still retained the vice of being contrary to public policy, and therefore void. It also was offered after most of the services to the tribe had been rendered and the prospects of a substantial recovery very good. Under the circumstances the Secretary of the Interior was right in rejecting the amendment.

The clear inference from this statement in the majority opinion is that the Secretary withheld his approval of the amendment to the contract because it was champertous and contrary to public policy. *This is not the fact.* The reasons for the rejection given by the Secretary were:

"The award in Docket 173 is the largest made by the Commission to date. The attorney fee provided for in the proposed modification of the attorney contract would be substantially larger than any fee previously allowed by the Indian Claims Commission. In these circumstances we conclude that the determination and allowance of attorney fees of such magnitude should follow the regular procedure before the Commission under the terms of the existing contract. We, therefore, disapprove the proposed contract.

Our conclusion certainly intends no reflection on the claims attorneys or the Executive Committee. Our high regard for the Executive Committee is well known, and we fully appreciate that the claims attorneys have long and ably represented the Tribe and have accomplished much in their behalf." [3]

Rather than pursue the matter further with the Interior Department, or attempt to enforce approval by court action, appellants then decided to apply to the Commission for the determination of attorneys' fees under sec. 15 of the Act, after approval by the Commission of the settlement of the Government's offset claims on August 8, 1963. A resolution was adopted and presented by the Executive Committee of the tribe asking that a flat ten percent fee be allowed by the Commission.

The Commission in its opinion "found it difficult to believe that the able and distinguished members of that Committee would have adopted such a resolution had they been acquainted with the facts and the law applicable to these facts." This rather paradoxical conclusion ignores statements to the Commission by three of the most able and distinguished members of the Committee that they were thoroughly familiar with the extent of the work done by the attorneys in this case, and with the facts of the case. One of these members was a Justice of the Supreme Court of Oklahoma; another was a distinguished lawyer of 52 years' experience in practice, including 25 years in the office of the Solicitor of the Interior Department, and the third was a distinguished lawyer with 45 years of practice. The conclusion by the Commission that these "able and distinguished" members of the Committee adopted the resolution in ignorance of the law and the facts, was unwarranted—particularly in a matter of such grave import as the Commission's charge of champerty in the contract negotiations by the tribal committee and its attorneys.

Appellant attorneys stated in the hearings before the Commission that they would not make any claim for reimbursement of expenses, regardless of whether or not the Commission allowed the ten percent contract fee, because of their original agreement with the tribe. They have repeated this statement on this appeal. Nevertheless, it would be better if the attorneys submit their expenses for reimbursement, including the expert witness fees, upon this remand, to the Commission. In any event, the Commission

---

3. Free Application Correspondence following Niebell Statement, letter February 18, 1963, Sol. Frank J. Barry to Paul M. Niebell.

is never bound by any specified percentage providing it does not exceed ten percent in fixing the attorneys' fees or in determining the reimbursement of expenses. The conclusion of the Commission majority that the attorneys' contingent fee contract for a flat ten percent was champertous and void, was in error.

The grounds for this appeal by the Cherokee Nation and its attorneys are that the award in final order, findings and opinion of the Indian Claims Commission, fixing the attorneys' fees at $1,000,000.00, or 6.96 percent of the final net judgment of $14,364,476.15 is arbitrary, unreasonably low and unrealistic, and not in accord with the precedents of awards made in the decided cases, which by law, the Commission was required to follow.

Section 15 of the Indian Claims Commission Act, 25 U.S.C. § 70n (1958 ed.) embodies the Congressional directives with respect to attorneys' fees:

> Each such tribe, band or other identifiable group of Indians may retain to represent its interests in the presentation of claims before the Commission an attorney or attorneys at law, of its own selection, whose practice before the Commission shall be regulated by its adopted procedure. The fees of such attorney or attorneys for all services rendered in prosecuting the claim in question, whether before the Commission or otherwise, shall, unless the amount of such fees is stipulated in the approved contract between the attorney or attorneys and the claimant, be fixed by the Commission at such amount as the Commission, *in accordance with standards obtaining for prosecuting similar contingent claims in courts of law,* finds to be adequate compensation for services rendered and results obtained, considering the contingent nature of the case, plus all reasonable expenses incurred in the prosecution of the claim; but the amount so fixed by the Commission, exclusive of reimbursements for actual expenses, shall not exceed 10 per centum of the

amount recovered in any case. * *
[Emphasis supplied.]

In pointing out the fact that "our records show that we have allowed smaller fees than the ten percent permitted by Section 15 of the Claims Act," the Commission added, "Each case must be judged, of course, on the facts peculiar to it and not entirely on any general formula or practice."

Apart from the above citation of this section, we can find nowhere in the Findings or Opinion of the Commission any reference to "standards obtaining for prosecuting similar contingent claims in courts of law," nor is there anything in the record to establish that these specific standards were considered and applied by the Commission in fixing the attorneys' fees. On the contrary, there is no reference in the Commission's opinion to the "standards obtaining" nor is there one citation of authority from the "courts of law" on this point.

In Confederated Bands of Ute Indians v. United States, 120 Ct.Cl. 609 (1951), the net judgment was $31,938,473.43. The court there reduced the attorneys' fees from a permissible $3,193,847.34 at ten percent of the net recovery to $2,800,000.-00 (8.76 percent). Even so, the court only reduced the fee $393,847.34 whereas the reduction in the present case amounts to $336,447.61 on a net total recovery of less than half that in the *Ute* case, supra. While the court in *Ute,* supra, did say that a ten percent fee of $31,938,473.43 "shocks us somewhat," [p. 681] it did not state that the size of the fee, of itself, was a determinative standard.

The court there stated in finding 92, at p. 667: "The following factors are among the criteria generally considered in awarding compensation to attorneys:

\* \* \* \* \* \*

(1) The nature of the undertaking and the character of the services required.

(2) The responsibility assumed.

(3) The professional repute, standing, ability and experience of counsel.

(4) The services rendered, including the time and labor required.

(5) The magnitude and importance of the cases.

(6) The novelty and difficulty of the questions involved.

(7) The opposition encountered.

(8) The results accomplished and the benefits flowing to the clients.

(9) The professional competence displayed, including skill, industry and diligence.

(10) The fidelity of counsel to the interests of their clients.

(11) The contingent nature of the employment and the hazards and risks involved.

(12) The loss of income and opportunities for other employment due to employment of counsel in the litigation for which compensation is to be awarded.

(13) Customary charges and going rates of attorneys for similar services. * * *

For the Commission to here conclude that "the fee allowed is the largest *we have ever awarded in any case to date*," (Emphasis supplied), is no evidence of consideration by the Commission of comparable standards in other "similar contingent claims in courts of law." This is particularly true when we consider the fact that the 6.96 percent is the *lowest percentage* ever fixed by the Commission.

The Commission pointed out that since the Cherokee Nation had a United States patent to the lands in question before the suit, no aboriginal title problems involving the usual difficulties of evidence and description of land areas were present in this docket. However, the Commission noted, "The question of the nature of this title was raised in the instant case by the defendant in spite of the treaty agreement and the issuing of patents and the inconsistent position the defendants had taken in Docket No. 2, supra" * * (The Cherokee Outlet lands, part of which are involved in this case).

As found by the Commission, these attorneys, under the responsibilities imposed upon them under their original contingent fee contract of 1948 as amended in 1958, prosecuted to final conclusion without compensation over the period 1947 to 1954 seven other cases before their successful prosecution of the present claim. Nevertheless, two of these prior dockets, Nos. 2 and 24, involved highly important legal questions of jurisdiction and title to Cherokee lands and "These decisions were referred to and followed by the Commission in deciding the present case, Docket No. 173," as found by the Commission.[4] There is no indication in the opinion of the Commission on the attorneys' fees that any consideration was given to the legal services performed by appellants in these two other essential cases over a long period of years without compensation.

◼ While the Commission may be correct in stating that it cannot grant *additional fees* or expenses in Docket 173 for services rendered in other claims of

---

4. Two of the above cases, though unsuccessfully prosecuted, inured to the benefit of the Cherokee Nation in Docket 173, which resulted in the final judgment entered in Docket 173. Docket No. 2 settled for the first time the question of the Commission's jurisdiction under Section 2, Clauses 3 and 5 of the Indian Claims Commission Act, and determined that the new causes of action created for the first time by said Act, and not available to claimants in prior litigation, were not *res judicata* as a result of prior litigation of the same subject matter between the same parties; and reaffirmed the question of the nature of the title of the Cherokee Nation to its Outlet lands, the subject matter of Docket 173, with the Commission holding the Cherokee Nation had a fee simple title to its Outlet lands (2 Ind.Cl.Comm. 7), which decision was affirmed on appeal by the Court of Claims (124 Ct.Cl. 127). Docket No. 24 involved the question of title to Cherokee lands in Indian Territory, including their Outlet lands, and the construction of Cherokee Treaties with relation thereto (1 Ind.Cl.Com. 165 and 2 Ind.Cl.Comm. 37; 124 Ct.Cl. 315). These decisions were referred to and followed by the Commission in deciding the claim in Docket 173.

the tribe which may have been prosecuted by their attorneys, the Commission should have considered the work of the attorneys in these other two cases to which we have referred in determining the fee in this case. Certainly, the efforts of counsel therein inured to the benefit of the tribe in the successful decision in the present case, particularly in view of the high degree of legal ability, experience and industry of the tribal attorneys, as previously attested to by the Solicitor of the Interior, and by the Commission in its finding that:

> "The responsibility undertaken by the attorneys required versatile skills. It required counsel who were experienced in Indian matters and knew how to investigate the tribal relations between the Cherokees and the United States, where to obtain the source materials, and who had experience in the prosecution of large and complicated Indian claims cases."

In its majority opinion, the Commission stated:

> "In the instant case the Cherokee tribe has been ably represented and the attorneys are entitled to a reasonable, fair, and adequate award for services rendered."

The Commission has stressed the fact that this fee is the largest award without also pointing out that this judgment is by far its largest judgment. Also emphasized was the fact that "we have allowed smaller fees" than the permissible ten percent under the Act without mention of the fact that this fee is the smallest in terms of percentage.

Commissioner Scott in his dissenting opinion has exhaustively reviewed previous awards of attorneys' fees in Indian claims cases by this court and by the Commission. His review is of course subject to the usual statistical infirmities inherent in comparing cases with varying fact. Nevertheless, in the aggregate, the comparison is informative as to overall trends in the determination of fee-awards in Indian claims cases.

Out of 35 fee-awards by the Commission, 25 resulted in ten percent fees; three in ten percent on part of the judgment, and eight percent for the remainder; four awards varying from nine percent to 9.5 percent, and only three less than nine percent, one for 8.9, one for 8.19 and the other for 7.5 percent, as compared to the present award of 6.96 percent. For example, in the *Crow* case,[5] noted by Commissioner Scott, the judgment was for $10,242,985.00, the fee award was $921,869.00, or nine percent. The judgment in this case was $4,121,491.65 more than that in the *Crow* case; but the fee is only $78,131.00 more. Indian title was recognized in both cases, and the other comparable factors in the two cases fail to establish any substantial reason for the wide disparity between the Crow nine percent and the Cherokee 6.96 percent.

Prior to the ten percent limitation fixed by law on contingent fees, this court made fee-awards ranging from 18 percent to 11.4 percent for an average of 14.8 percent. After enactment of the ten percent limitation, in 17 out of 21 cases, the court itself allowed the full ten percent, including the fee-award of $850,000.00 on an $8,500,000.00 judgment in Menominee Tribe v. United States, 121 Ct.Cl. 492 (1952). This net judgment is $5,864.476.15 less than the Cherokee judgment, whereas the fee is only $150,000.00 less than the Cherokee fee. The principal reason given by the court for the full ten percent award to the Menominee attorneys was the management of the case with more than ordinary skill and diligence. From the findings by the Commission and the expressions by the Interior Department, we conclude that the Cherokee attorneys likewise managed their case with more than ordinary skill and diligence.

In *Confederated Bands of Ute Indians*, supra, the net judgment was for $31,938,473.43. With the exception of three other

---

5. Crow Indian Tribe, Docket No. 54, Indian Claims Commission.

smaller cases [6] where the court found that the services of the attorneys were deficient in quality or quantity, the Ute attorney fee was the smallest percentage— 8.766 percent. Although the court noted in *Confederated Bands of Ute Indians,* supra, p. 681, that the size of the fee "shocks us somewhat," the percentage reduction of the attorneys' fees was only 1.23 percent as compared to 3.1 percent of the fee for the Cherokee attorneys, where the Commission also stressed as a factor that this award was its largest in terms of dollar recovery.

If the Commission in this case had evidenced any concern in its opinion for the standards of comparison with other similar cases in courts of law, as required by section 15 of the Act, instead of demonstrating such overriding concern with the extraneous issue of champerty, we would not regard with the same scrutiny and significance the large disparity between the end result reached by the Commission in the fee-award in this case, and the end result it and this court have reached in practically all other fee-award cases. Under the circumstances here, however, this obvious disparity can hardly be ignored.

The Commission refused to consider the efforts of the attorneys in what is described as "public relations" as a factor in determining the fee because such activities did not contribute significantly to the prosecution of the claim. Although the Commission referred to this activity as "commendable," and Commissioner Scott stated that it was to "the everlasting credit" of the attorneys that they kept the 35,000 members of the tribe constantly advised on all phases of the case, the Commission concluded that there was only one client—the tribal entity that had to be kept advised.

■ Furthermore, the Commission stated that even if the service had been limited to informing the tribal chief and the Executive Committee, that limited service has generally not been considered

by counsel or the Commission as an additional compensable activity in the prosecution of Indian claims. This conclusion overlooks the fact that these attorneys were obligated under their approved contract not only to represent, but also to *advise* the widely scattered 35,000 members of the tribe. For example, the Commission refers to the activity of Attorney Pierce, who did most of this work. He devoted a minimum of 15,767 hours between 1948 and 1965, including 475 personal conferences with tribal members and others, and 2,539 letters to 785 individuals. This work was performed with no assurance that it would be paid for in any event, but it was an obligation under the contingent fee-contract, and was certainly done in good faith. We agree with the Commission that this was commendable, but we disagree with the conclusion that it should not be considered as an additional compensable activity.

■ We are of the same mind as to the refusal of the Commission to award any compensation for legislative work because it was not required in the prosecution of this claim. This work was deemed necessary by the tribe and its attorneys. Under the specific requirements of their approved fee-contract, it should have been considered in fixing the fee. For an allowance for legislative work and expenses under similar circumstances, see *Confederated Bands of Ute Indians,* supra.

■ Because of the successful negotiation of a stipulation with the Government, offsets claimed at $1,432,084.17 were reduced to $425,000.00. As Commissioner Scott has found, this resulted from the knowledge, ability and skill of appellant attorneys. The Government contends that this should be given no consideration because the determination of offsets was in another docket, No. 173–A, which was not concluded until 18 months after the final judgment in Docket 173. We do not agree. The net amount of this

6. Ute Indians v. United States, 45 Ct.Cl. 440 (1910); Klamath and Moadoc Tribes v. United States, 85 Ct.Cl. 451 (1937), affirmed 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219 (1938); Ft. Berthold Indians v. United States, 71 Ct.Cl. 308 (1930).

judgment was increased by $1,007,084.17 over the net judgment which would have resulted had the full amount of offsets claimed by defendant been allowed. This activity was essential to the successful end result of the prosecution of the claim. It should have been specifically considered by the Commission as a factor in the determination of the fee.

We also note that the Commission has not considered another fact referred to by Commissioner Scott in his dissent. As of December 31, 1963 the total accumulated interest borne from these tribal funds is $1,061,479.14. The early deposit of these funds in the Treasury upon the entry of judgment in 1961 resulted from actions following the expert judgment, advise and efforts of the appellant attorneys in view of the impoverished condition of the tribal entity, and this effort is entitled to consideration by the Commission in determining the fee-award.

The Commission refused to consider the time and activities devoted by counsel to the preparation and presentation of their claim for fees to the Commission because it is solely for their personal benefit. This work was required by the rules of the Commission. Rule 503.34b, Fed.Reg. No. 21, No. 216, November 6, 1956 Issue, and it is certainly a part of the services required of the attorneys in the prosecution of the claim.

The Commission has concluded that "most important of all is the fact that the Cherokee Nation under the Indian Claims Act had a sound cause of action." Actually, this was not a fact until these attorneys had first devoted much expert effort, research, and knowledge in the development of the case. In a broader sense, however, it is safe to assume that in all of the Indian claims cases where the attorneys were successful, they all had a sound cause of action. Another common factor applicable to all Indian claims cases is that, once a final award is made, no effort is required to collect the judgment, and yet the Commission notes this as "another item of considerable importance."

Appellee is correct in stating that we should not seek to impose our judgment in the matter. In remanding the case, we are not attempting to dictate either the fee-amount or percentage to be fixed by the Commission. However, adherence to the directives of section 15 of the Act, particularly as to conformity with the standards established in similar contingent claims in courts of law, and appropriate correction of the errors pointed out in this opinion should, in our opinion, result in a substantial increase in the fee awarded by the Commission. Accordingly, the determination by the Commission of the fee-award is reversed, and the case is remanded to the Commission for further proceedings to determine the fee-award in accordance with this opinion and sec. 15 of the Act.

Reversed.