355 F.Supp. 165 (1973)
UNITED STATES NATIONAL BANK OF GALVESTON, TEXAS, Plaintiff,
v.
MADISON NATIONAL BANK, Defendant.
Civ. A. No. 597-71.
United States District Court, District of Columbia.
February 27, 1973.
John F. Mahoney, Jr., Washington, D. C., for plaintiff.
Alexander E. Bennett, Washington, D. C., for defendant.

MEMORANDUM-ORDER
GASCH, District Judge.
This matter came on for consideration of cross-motions for summary judgment of the plaintiff, United States National Bank of Galveston, Texas (Galveston Bank) and the defendant Madison National Bank (Madison Bank). The plaintiff Bank filed the complaint on March 22, 1971, seeking a money judgment in the sum of $150,000.00 plus interest against the defendant Bank because *166 the latter has refused to honor its purported obligation to tender a time certificate of deposit to the plaintiff for collection. The resolution of the legal questions involved in this case requires a detailed understanding of the relationship and various financial transactions between Madison Bank, United Bonding Insurance Company (UBIC), United International, Inc. (UII), and Galveston Bank.
The statements of material facts as to which there is no dispute reveal that UBIC was a corporation engaged in the business of issuing fidelity and surety bonds. UII was organized in 1968 or 1969 as a holding company for UBIC for the purpose of purchasing from UBIC collateral and salvage which, under applicable insurance regulations, could not be carried as "admitted" assets on UBIC's books.[1] UII owned 100 percent of the capital stock of UBIC and the officers of the two companies, including the President, were the same during the period in question.[2] In addition, UII used the same offices as UBIC and UII's only employee was an accountant who worked in UBIC's offices and was apparently paid by UBIC.[3]
On March 28, 1969, defendant Madison Bank made a $450,000 loan to UII to enable UII to purchase from UBIC a receivable that could not be listed as an asset in the financial records of UBIC. The collateral given to secure UII's promissory note made in connection with the loan included, inter alia, an assignment of a mortgage note payable by Lammot DuPont Copeland, Jr., to Winthrop Lawrence and assigned thereby to UII in the amount of $750,000; a $450,000 guarantee executed by Mr. Copeland; and a bond issued by Prudence Mutual Casualty Company in the amount of $400,000. By June 29, 1970, the loan had been reduced to $275,000.
On October 30, 1969, Madison made a second loan to UII in the amount of $300,000. The collateral pledged as security for this loan consisted of 100 percent of the capital stock of UBIC; a $225,000 surety bond issued by Emmco Insurance Company; and a bond issued by UBIC in the amount of $75,000. The promissory notes signed by UII in connection with the loan granted Madison a lien "upon all property left with the said Bank whether held for safekeeping, for collection or for any other or different purpose, including any balance of deposit accounts with the said Bank . . .."[4] It was a condition of the loan that UBIC purchase from Madison a certificate of deposit in the amount of $150,000.[5] The funds for the purchase of the certificate of deposit were derived from the proceeds of Madison's loan to UII.[6] The certificate of deposit issued to UBIC was dated November 10, 1969, and its maturity date was November 10, 1970. It bore the inscription "NON-NEGOTIABLE," and stamped on its face were the words "No assignment shall affect the rights of the Bank until it receives written notice signed by the assignor and assignee."
On March 31, 1970, the $300,000 loan of October 30, 1969, was reduced to $250,000 and a new promissory note in that amount was executed by UII granting Madison a lien on the same terms as the notes in connection with the original loan.[7] The collateral pledged to secure the original loan, apart from the certificate of deposit, was replaced by 75,000 shares of the capital stock of UII and a $250,000 surety bond issued by Emmco Insurance Company.
On May 13, 1970, the President of Plaintiff Galveston Bank negotiated and *167 consummated a loan for $150,000 with UII payable on November 11, 1970. The purpose of the loan, according to a statement of a UII representative, was to meet "a minor problem of liquidity of United Bonding Insurance Company."[8] As security for the loan, Galveston Bank received the $150,000 certificate of deposit issued by Madison to UBIC; a bill of sale of the certificate from UBIC to UII dated May 12, 1970; a document dated May 12, 1970, assigning the certificate from UBIC to UII; and a document dated May 12, 1970, assigning the certificate from UII to Galveston Bank.[9] In addition, Galveston Bank was given a letter from UII dated May 13, 1970, which stated in part:
"We, United International, Inc., now wish to hypothecate both principal and interest on this Certificate of Deposit for a loan from the United States National Bank of Galveston of $150,000.00 for a period of six months term synonymous with the maturity date on the Certificate."[10]
On September 28, 1970, Madison sent a letter to UII demanding full payment of the principal and interest outstanding on the first loan because UII had not made a payment of principal due on September 27, 1970. Madison also wrote another letter on October 7, 1970, advising UII that under the terms of the note given in connection with the second loan, now reduced to $250,000, Madison deemed the security insufficient, and demanded that UII provide additional security by October 9, 1970. The letter also stated that the entire principal of the loan would be due and payable if the requested collateral was not furnished by October 9, 1970. Madison received no response to either letter, and no additional security was supplied by UII.
According to the uncontested statement of facts, Madison Bank, on October 12, 1970, filed a proof of claim in the liquidation of Prudence Mutual Guarantee Company regarding the bond given by that company on the first loan. On the same date, Madison wrote to Lammot DuPont Copeland, Jr., demanding payment of a promissory note pledged with Madison as collateral for that loan. Madison filed suit against Emmco Insurance Company in the United States District Court for the District of Columbia on October 15, 1970 following Emmco's failure to make payment on surety bonds supplied by it in connection with the two loans to UII.
As a result of an article that appeared in the Wall Street Journal on October 20, 1970, the President of Galveston Bank directed that an inspection be made of the files on its loan to UII.[11] On October 21, 1970, Galveston sent a letter to Madison, enclosing copies of the certificate of deposit, the bill of sale from UBIC to UII, and the assignment from UII to Galveston, and asked Madison to acknowledge that the letter constituted notice to it that Galveston considered itself "the potential owner of the Certificate of Deposit in question in the event that United International fails to discharge its obligation to us."[12] On November 3, 1970, Madison replied to Galveston's letter, stating that the $150,000 certificate of deposit had been set off by Madison against UII for the loans that were already in default. The Galveston loan to UII went into default on November 10, 1970, and after Madison refused payment of the certificate of deposit, Galveston instituted this cause of action seeking judgment against defendant Madison Bank in the sum of $150,000 plus interest. Based upon the undisputed statements of facts and the entire record herein, both plaintiff and defendant have asked this Court to resolve the questions of law and dispose of the case on summary judgment.
*168 In its motion for summary judgment, plaintiff argues that Madison Bank should not be allowed to set off the $150,000 certificate of deposit issued to UBIC against debts owed to it by UII because the requisite `mutuality of obligation' between debtor and creditor is not present. Specifically, plaintiff contends that where a certificate of deposit has been assigned by a depositor (UBIC), the issuing bank (Madison) cannot defeat a subsequent assignee's (Galveston's) claim for payment by offsetting that certificate against a debt owed by one (UII) who is neither the original depositor nor the holder of the certificate. Although this general proposition has some superficial attraction, after a closer examination of the facts and circumstances surrounding the financial transactions that occurred in this case and the relationship between UBIC and UII, it must be concluded that Madison properly exercised its right to set off the certificate of deposit against the indebtedness of UII.
The plaintiff's argument that there is no "mutuality of obligation" between Madison Bank and UBIC is based on the assumption that UII and UBIC are separate and distinct corporate entities. Although bearing a different corporate name, it cannot be seriously contended that UII existed independently from UBIC. The plain facts reveal that the interests, operation, and control of UBIC and UII were so intertwined that under any reasonable legal standard the two companies comprised a single entity with a single purpose.
The prevailing principle of law for determining whether the facade of corporate existence should be lifted has been summarized by a notable commentator in the following way:
"the corporate entity is disregarded [where] it is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of another corporation. The control necessary to invoke what is sometimes called the `instrumentality rule' is . . . such domination of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principal."[13]
Applying this rule to the salient facts in this case compels the conclusion that there is such a unity of interest and ownership between UBIC and UII that any individuality of separateness has ceased to exist. The record reveals that UII was incorporated in late 1968 or early 1969 as a holding company for UBIC. As explained by the former President of UII and UBIC, the sole function of UII was simply to purchase collateral and "salvage" from UBIC which, under Indiana insurance law, could not be carried as "admitted" assets on UBIC's books.[14] It is undisputed that UII's only purpose was to provide a corporate mechanism for engaging in business transactions to strengthen UBIC's financial posture and to satisfy regulatory requirements. The record indicates that UII owned 100 percent of the capital stock of UBIC; the officers of the two companies, including the President, were the same during the period in question; UBIC and UII used the same offices and their correspondence listed the same address; and UII's only employee was an accountant who worked in UBIC's office and was apparently paid by UBIC.[15]
A survey of the events that transpired before Madison Bank issued the loans to *169 UII underlines the interdependence of UII and UBIC. In early 1969, UII obtained a $450,000 loan from Madison to permit the purchase of a "non-admitted" receivable from UBIC prior to the time UBIC had to file its annual statement. The sole purpose of this UII loan, therefore, was to benefit UBIC by replacing a "non-admitted" asset with an "admitted" cash asset on the books of UBIC. Madison's second loan to UII in the sum of $300,000 further demonstrates the intimate relationship existing between UII and UBIC. It was a condition of the loan that UBIC purchase the $150,000 certificate of deposit from Madison. Moreover, the proceeds of the loan provided the funds for UBIC's purchase of the certificate of deposit.[16]
Plaintiff's counsel has conceded the proposition that although the loans were nominally made to UII, their purpose was to assist UBIC.[17] Furthermore, Galveston Bank itself knew, at the time it issued its loan to UII, that UII was merely the holding company for UBIC and that the proceeds of the loan were going to UBIC in order to alleviate a "minor liquidity problem" of UBIC.[18] The assignments of the certificate of deposit from UBIC to UII and from UII to Galveston Bank were in identical form, were both dated May 12, 1970, and were executed by the same personin the first instance in his capacity as a vice president of UBIC and in the second instance in his capacity as a vice president of UII. Under these circumstances Galveston Bank cannot assert that it had reasonably relied on any significant distinction between UBIC and UII when it made the loan to UII. In sum, the defendant Madison Bank was fully justified in considering UII and UBIC a single business enterprise, and it was clearly entitled, therefore, to set off the certificate of deposit issued to UBIC against the financial obligations of UII.
As Madison Bank rightly points out, even if UBIC and UII were considered wholly independent corporations, Madison would nevertheless be permitted to exercise the setoff under the general rules of assignment law. A brief outline of the facts discloses the following: Madison issued the certificate of deposit to UBIC; UBIC, the assignor, assigned the certificate to UII; UII, the sub-assignor, then assigned a security interest in the certificate to Galveston Bank, the sub-assignee. The question is whether Madison has lost the right to set off the $150,000 represented by the non-negotiable certificate against the debt owed to it by UII, because UII has further assigned the certificate to the sub-assignee, Galveston Bank. It is well settled that an assignee of a non-negotiable chose in action acquires no rights superior to those held by his assignor and is generally subject to any setoff available to the obligor against the assignor. Union National Bank of Freemont v. Village of Beemer, 123 Neb. 778, 244 N.W. 303 (1932). See generally Fidelity Mutual Life Insurance Co. v. Clark, 203 U.S. 64, 27 S.Ct. 19, 51 L.Ed. 91 (1906); Fox-Greenwald Sheet Metal Co., Inc. v. Markowitz Bros., Inc., 147 U.S.App.D.C. 14, 452 F.2d 1346, 1357 n. 69 (1971); Crossman v. Fontainebleau Hotel Corp., 273 F.2d 720 (5th Cir. 1959); National City Bank of Evansville v. United States, 163 F.Supp. 846, 143 Ct.Cl. 154 (1958). A recent draft of the Restatement (Second) of Contracts reads in pertinent part:
"Just as an assignee is subject to defenses and claims accruing before the *170 obligor receives notification, so a sub-assignee is subject to defenses and claims accruing between assignee and obligor before the obligor receives notification of a subassignment."
Restatement (Second), Contracts § 168, comment e at 30 (Tent.Draft No. 4, 1968).
Referring to the parties in the instant case, the rule is illustrated as follows:
"7. B [comparable to Madison in this illustration] owes A [UBIC] $100. A assigns the right to C [UII], and C assigns it to D [Galveston Bank]. C owes B $50. Unless a statute provides otherwise, B can set off against D the debt owed by C only if it becomes due before B receives notification of the assignment by C."
Restatement (Second), Contracts, supra, at 30-31. The above illustration is based on Union National Bank of Freemont v. Village of Beemer, 123 Neb. 778, 244 N.W. 303 (1932); cf. Produce Exchange Bank v. School District, 138 Kan. 834, 28 P.2d 742 (1934); Martin v. Richardson, 69 N.C. 255 (1873). As applied to the facts herein, this rule of modern commercial practice permits Madison to set off the funds represented by the certificate against the obligations of UII. Indeed, the validity and applicability of this rule is further supported by the simple fact that plaintiff Galveston Bank has made no effort to respond to Madison's argument based on the principles of assignment law.
Plaintiff also argues in its motion for summary judgment that Madison Bank should be barred from applying "the debtor's deposits against the debtor's debts where the bank has knowledge of certain circumstances giving rise to the equitable interest of another to that deposit."[19] Plaintiff does not dispute the validity of Madison's right to set off the certificate based upon the common law device known as the "banker's lien," and the express lien granted to Madison "upon all property left with the Bank whether held for safekeeping, collection, or for any other or different purpose, including any balance of deposit accounts with the said Bank."[20] However, plaintiff apparently does contend that its security interest in the certificate is superior to the defendant's interest because Madison's right to set off had not accrued until after it received notice of the plaintiff's claim to the certificate. According to the facts outlined earlier in this opinion, Madison's loans to UII were declared in default before Galveston Bank gave notice of its interest in the certificate and prior to the time that Galveston's loan to UII had become due and payable. Therefore, Madison's right to set off the $150,000 certificate of deposit against UII's indebtedness arose before it was made aware of any subsequent interest in the certificate. The controlling principle of law has been well stated in the Restatement of Contracts:
"An assignee's right against the obligor is subject . . . to all set-offs and counterclaims of the obligor which would have been available against the obligee had there been no assignment, provided that such set-offs are based on facts existing at the time of the assignment, or are based on facts arising thereafter prior to knowledge of the assignment by the obligor."[21]
Under this rule, Galveston could not have established a firm legal interest in the certificate of deposit until it notified Madison that the certificate had been assigned to it as security on a loan to UII. It is indeed peculiar that Galveston *171 did not deem it necessary to immediately advise Madison that the certificate had been assigned to it in connection with a loan, especially since the certificate was clearly designated "NON-NEGOTIABLE." The certificate was also conspicuously stamped "No assignment shall affect the rights of the Bank until it receives written notice signed by the assignor and assignee." Furthermore, the President of Galveston has admitted that he knew at the time the UII loan was consummated that UBIC had a poor financial reputation in the insurance business, that UII was the holding company for UBIC, and that the certificate of deposit was with Madison Bank as a "compensating balance" for a loan.[22] Despite all these warning signals, Galveston Bank did not take the basic precaution of checking with Madison concerning the status of the certificate prior to granting UII the loan, and it did not notify Madison of its security interest in the certificate until October 20, 1970. Due to Galveston's unexplained lack of diligence, Madison did not receive notice of the assignment until after its loans with UII were in default and its right of setoff had accrued.[23] Under these circumstances, Madison can hardly be charged with any "knowledge of special circumstances." On the contrary, if such an accusation can be fairly aimed at any party to this action, it must be Galveston Bank. In any event, Galveston's belated attempt to inform Madison of its interest in the $150,000 certificate of deposit cannot operate to defeat Madison's right to set off the certificate against the UII loans already in default when notice was received.
Galveston Bank also contends that Madison Bank may not exercise its set-off because UII's indebtedness is allegedly protected by other collateral security. In making this argument Galveston relies upon an outdated rule that has received marginal support in only a few jurisdictions. The better rule of law, and one that this Court adopts, was articulated in Olsen v. Valley Nat'l Bank of Aurora, 91 Ill.App.2d 365, 234 N.E.2d 547, 550 (1968):
"A bank should not be deprived of its right of set-off simply because it has the foresight to obtain collateral in exchange for obligations owed to it. The majority rule . . . is founded on the rationale that a creditor is able to pursue any one of a number of remedies against a debtor until the debt is satisfied. The minority rule is based upon the rule or statute that there is but one action for the recovery of a debt which is secured by collateral."
Even assuming that Madison could collect on the other collateral pledged as security for UII's loanswhich is apparently a questionable assumptionthere is no reasonable legal requirement that it choose one avenue of recovery instead of another. So long as Madison has not in fact collected the full amount owing on the loans, it still may exercise its right to set off the certificate against UII's obligations.
Finally, Galveston Bank has impliedly argued that this Court should utilize a `balancing of the equities' approach and thereby grant the plaintiff summary judgment. If this case could be realigned with UII and UBIC on one side and Galveston Bank and Madison Bank on the other side, then certainly both Galveston and Madison could be considered the innocent parties. However, as between Galveston and Madison, it was Galveston that was in a better position to safeguard its interests by utilizing elementary procedures that would have obviated this litigation. It is unnecessary to reiterate the blatant facts that *172 should have placed Galveston on notice that the certificate of deposit was subject to a lien and possible setoff by Madison. For some unexplained reason Galveston apparently chose to ignore its duty to inquire about the status of the non-negotiable certificate with Madison, and instead, decided to process the UII loan in an unusually short period of time. It compounded this regrettable omission by failing to give timely notice to Madison of its asserted security interest in the certificate. It is a basic precept of common law that where one of two innocent parties must bear the loss caused by the default of a third party, the burden should fall on the party in a better position to have avoided the loss. Since the loss in this case is attributable to Galveston Bank's failure to follow fundamental procedures generally employed in commercial practice, this Court concludes that Galveston Bank, not Madison, should therefore bear the loss.
NOTES
[1] Deposition of Frank E. Wright, Tr. 6.
[2] Id., Tr. 32, 35-36.
[3] Id., Tr. 35-36.
[4] Defendant's Answers to Plaintiff's Interrogatories, filed November 29, 1971, Exhibit O.
[5] Id., paragraphs 1-3; see Exhibits A and S, and Deposition of Frank E. Wright, Tr. 28.
[6] Id., paragraph 3; see Exhibit S.
[7] Id., Exhibit Q.
[8] See letter dated May 13, 1970, from Frederick F. Babo, Secretary-Treasurer of UII, to the United States National Bank, Galveston, Texas, Exhibit G-8.
[9] See Exhibits G-1 through G-4.
[10] See Exhibit G-8.
[11] Deposition of William G. Spruill, Tr. 93.
[12] Exhibit G-9.
[13] Fletcher on Corporations § 43, at 203-05 (Rev. ed. 1963). The "instrumentality rule" has been often stated. See, e. g., Chicago M. & St. P. Ry. Co. v. Minneapolis C & C Assoc., 247 U.S. 490, 501, 38 S.Ct. 553, 62 L.Ed. 1229 (1918); Acme Precision Products, Inc. v. American Alloys Corp., 422 F.2d 1395 (8th Cir. 1970); Francis O. Day Co., Inc. v. Shapiro, 105 U.S.App.D.C. 392, 267 F.2d 669 (1959); Fisher v. First National Bank of Omaha, 338 F.Supp. 525 (S.D. Iowa 1972); Mull v. Colt Co., 31 F.R.D. 154 (S.D.N.Y.1962); Service Afloat, Inc. v. United States, 337 F.Supp. 458 (Cust. Ct.1972).
[14] Deposition of Frank E. Wright, Tr. 6.
[15] Id., Tr. 36.
[16] Id., Tr. 28. See Defendant's Answers to Plaintiff's Interrogatories, filed November 29, 1971, Exhibits A and S.
[17] "It would appear then that the first loans made by Madison to UII had a two-fold purpose. First, the money was used to purchase the aforementioned non-admitted asset to give United Bonding the cash to satisfy the state regulatory requirements in Indiana and, secondly, to provide the funds by which United Bonding could purchase the certificate of deposit in question from Madison."

Memorandum of Points and Authorities of Plaintiff in Opposition to Motion of Defendant for Summary Judgment, at 4.
[18] Deposition of William G. Spruill, Tr. 64-66, 75.
[19] Motion of Plaintiff for Summary Judgment, at 2.
[20] See notes 4 and 7, supra.
[21] Restatement of Contracts § 167(1) (1932), cited with approval in Glassman Construction Co. v. Fidelity & Casualty Co. of N. Y., 123 U.S.App.D.C. 1, 356 F.2d 340, 342 n. 3, cert. denied, 384 U.S. 987, 86 S.Ct. 1890, 16 L.Ed.2d 1005 (1966). See also Restatement (Second) of Contracts § 168(2) at 26 (Tent. Draft No. 4, 1968).
[22] Deposition of William G. Spruill, Tr. 65-66, 74-75.
[23] The fact that Madison may not have registered the setoff on its financial records prior to receiving notice of the assignment does not operate to defeat its right of setoff. See generally, Maryland Casualty Co. v. National Bank, 320 Pa. 129, 182 A. 362 (1936); Aarons v. Public Service Building & Loan Ass'n, 318 Pa. 113, 178 A. 141 (1935).