**EVERETT PLYWOOD CORPORATION,**
a Washington Corporation

v.

**The UNITED STATES.**

No. 199–75.

United States Claims Court.

Nov. 4, 1983.

See also 651 F.2d 723, 227 Ct.Cl. 415.

William F. Lenihan, Seattle, Wash., for plaintiff. Sigurd Borgersen and Lenihan, Ivers & McAteer, P.S., Seattle, Wash., of counsel.

Frances L. Nunn, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant.

## OPINION

HARKINS, Judge:

Everett Plywood Corporation (plaintiff) has applied for attorney fees and expenses under the Equal Access to Justice Act (EAJA)[1] as the prevailing party in a breach of contract action involving a timber cutting contract. The contract, awarded by the Forest Service of the Department of Agriculture, was to clearcut and purchase timber from four designated logging units in the Mt. Baker National Forest, Snohomish County, Washington (the ARM timber sale). The contract was canceled, effective November 9, 1973, by the Secretary of Agriculture for environmental reasons.

Plaintiff's petition (now complaint) was filed in the United States Court of Claims on June 12, 1975, and a 6-day trial was held in February 1978. The trial judge's opinion, filed December 28, 1979, recommended that defendant was not liable for breach of contract on the ground that, under the doctrine of frustration of contract purpose, the Secretary's November 9, 1973, cancellation was lawful in the exercise of responsibility for the care and preservation of the environment in Mt. Baker National Forest. In an opinion dated May 20, 1981,[2] the Court of Claims held that defendant's unilateral termination of contract was a breach that entitled plaintiff to recover compensable costs and breach damages by the formula set out in 36 C.F.R. § 223.9(a)(5) (1980), entered judgment for plaintiff on entitlement, and remanded the case to the trial division to calculate damages, without interest.

On October 1, 1981, the effective date of the EAJA, this case was pending in the trial division of the Court of Claims; and on October 1, 1982, it was transferred to the United States Claims Court pursuant to section 403(d) of the Federal Courts Improvement Act of 1982.[3] On May 16, 1983, after a prolonged period of negotiation, pursuant to the stipulation of the parties, the United States Claims Court entered judgment for plaintiff in the sum of $370,000. The stipulation for entry of judgment reserved the position of the parties on the question of a claim under the EAJA.[4] Plaintiff's application for attorney fees and expenses was timely filed on June 15, 1983.

Defendant argues that the Claims Court lacks jurisdiction to award attorney fees, expenses and costs authorized by the EAJA because it is "not a court of the United States" established under Article III of the Constitution. Defendant's contention has been considered, and rejected, by

---

1. Pub.L. No. 96–481, 94 Stat. 2327, 28 U.S.C. § 2412 (Supp. V 1981).

2. *Everett Plywood Corp. v. United States,* 651 F.2d 723 (Ct.Cl.1981) (*Everett Plywood III*). Two prior cases, unrelated to the ARM sale, were brought in the Court of Claims by plaintiff for breach of Forest Service timber sale contracts: *Everett Plywood & Door Corp. v. United States,* 419 F.2d 425, 190 Ct.Cl. 80 (1969) (*Everett Plywood I*); and *Everett Plywood Corp. v. United States,* 512 F.2d 1082, 206 Ct.Cl. 244 (1975) (*Everett Plywood II*).

3. 28 U.S.C.A. § 171 note (1983).

4. Paragraph 4 of the stipulation provides:

"4. Under the terms hereinafter stated, the United States agrees to the entry of judgment in favor of Everett Plywood Corporation and against the United States in the amount of $370,000 in full satisfaction of all claims arising out of, or related to the matters involved in the aforementioned suit, including, but not limited to all claims for costs, expenses, and damages of any kind. It is agreed that plaintiff may pursue and defendant may oppose the question of attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412."

the Federal Circuit with respect to cases that were pending in the Court of Claims on October 1, 1981, the effective date of the EAJA, and transferred undecided to the Claims Court on October 1, 1982, pursuant to section 403(d) of the Federal Courts Improvement Act of 1982.[5] Section 403(d) is not a transfer provision that requires an independent basis for decision. It provides that "Any matter pending before a commissioner of the United States Court of Claims on the effective date. . . . shall be determined by the United States Claims Court." This language requires this court to enter a final judgment on plaintiff's application for attorney fees which was ordered on August 31, 1982, to be filed.

■ Defendant urges that *Ellis* is not applicable to the facts of this case because the "matter" before the trial judge on October 1, 1982, was not a "cause of action" for attorney fees and expenses, but was the merits of the case in chief, the issue of damages. Defendant asserts that the cause of action for attorney fees did not accrue until entry of the money judgment on May 16, 1983, and, consequently, the attorney fees issue is not being determined pursuant to section 403(d). Defendant misses the point. The Federal Circuit opined in *Ellis* that nothing in the Improvement Act or in its legislative history suggests that a prevailing plaintiff would be divested of the opportunity to pursue an award of fees and costs because of the transfer provisions contained in the Act.[6] Plaintiff's eligibility to pursue attorney fees necessarily was part of the "matter" pending before the Court of Claims commissioner on September 30, 1982, and undecided by the Court of Claims on that date.

■ The EAJA provides in 28 U.S.C. § 2412(d)(1)(A) that attorney fees and other expenses may be awarded to the prevailing party in a civil action brought by or against the United States "in any court having jurisdiction of that action." With respect to matters begun on or after October 1, 1982, the Claims Court clearly is vested with jurisdiction under 28 U.S.C. § 1491 over timber cutting contracts. This jurisdiction would include the power to award attorney fees and expenses on plaintiff's application in this case.[7]

■ A prevailing party, other than the United States, in civil actions not sounding in tort brought by or against the United States, may be awarded attorney fees and expenses in the absence of a finding by the court that "the position of the United States was substantially justified or that special circumstances make an award unjust."[8] One purpose of the EAJA is "to diminish the deterrent effect of seeking review of, or defending against, governmental action."

■ The Act specifies that an application for fees and expenses is to be submitted within 30 days of final judgment, with an itemized statement that shows actual time expended and rates used in computations. The definition of fees and expenses requires that expenses of expert witnesses be "reasonable" and that attorney fees be "reasonable". The amount of fees are to be based upon "prevailing market rates" for the kind and quality of the services furnished. Attorney fees "shall not be awarded in excess of $75 per hour unless the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a higher fee."[9]

■ The content of the authority conferred by the EAJA to award attorney fees and expenses has been considered in a number of cases. The EAJA authorizes pay-

---

5. *Ellis v. United States,* 711 F.2d 1571 (Fed.Cir. 1983).

6. Id. at 1574.

7. *Greenberg v. United States,* 1 Cl.Ct. 406, 407 (1983) (Kozinski, C.J.); *Bailey v. United States,* 1 Cl.Ct. 69 (1983) (Wood, J.).

8. 28 U.S.C. § 2412(d)(1)(A) (Supp. V 1981).

9. 28 U.S.C. § 2412(d)(2)(A) (Supp. V 1981).

ment of attorney fees and related expenses incurred before the effective date, October 1, 1981, as well as those incurred after that date.[10] The United States bears the burden of proving its position was substantially justified.[11] The test for determining whether the Government's position was substantially justified is one of reasonableness. Where the Government can show that its position had a reasonable basis both in law and in fact, no EAJA award can be made.[12] In determining whether the position of the United States was substantially justified in a particular case, the position taken by the Government before the court is the subject of inquiry, not the position taken during the administrative action.[13]

■ A primary purpose of the EAJA is to eliminate legal expense as a barrier to challenges of unreasonable governmental action. Accordingly, attorney fees and expenses may be assessed against the Government for a separate phase or portion of the litigation in which the Government's position lacks substantial justification, even though the Government may have adopted wholly reasonable positions in other parts of the case.[14]

This case on the question of substantial justification for defendant's position falls into three distinct phases or periods: (1) I, the trial period, June 12, 1975, to December 28, 1979; (2) II, the appeal period, December 28, 1979, to July 10, 1981 (plaintiff's motion for clarification and/or amendment of opinion denied); and III, the damages period, July 10, 1981, to June 15, 1983. Defendant has not shown that its litigating position during the trial period (I) and the damages period (III) was substantially justified.

Prior to the Secretary's unilateral cancellation of the ARM sale, effective November 9, 1973, the Forest Service, in its administration of the ARM sale contract, had taken the position that such action would breach the contract and expose the Government to a claim of damages. The Deputy Chief of the Forest Service on June 6, 1972, had advised the Regional Forester that the Office of General Counsel and, informally, the Comptroller General, had confirmed that the ARM sale contract could not legally be modified in the circumstances. In the event that the contract was canceled upon completion of logging in unit No. 2, the Deputy Chief stated, such action would be a breach that would expose the Government to a claim for damages, to be processed through the Comptroller General or the United States Court of Claims. The letter further advised that, in order to expedite settlement of the claim, the Regional Forester should seek agreement as to the amount of the claim which will result from the breach. On September 13, 1972, the Deputy Chief advised the Regional Forester environmental damage could necessitate a suspension if a contract modification could not be negotiated. He noted that the ARM sale contract did not authorize suspension on environmental grounds, that the plaintiff had not breached any provisions of the contract, and that they were, in effect, suspending operations without cause.

Notwithstanding the Agriculture Department's recognition that the Secretary's cancellation had no support in the contract, plaintiff was forced to litigate its claim. During the trial period, defendant's counsel refused to concede liability, but at the same time declined to present a defense. No effort was made to negotiate a settlement of the claim until the damages period.

---

10. *Kay Mfg. Co. v. United States,* 699 F.2d 1376, 1378 (Fed.Cir.1983).

11. *Knights of the Ku Klux Klan v. East Baton Rouge,* 679 F.2d 64, 68 (5th Cir.1982); H.R.Rep. No. 96–1418, 96th Cong., 2d Sess. 10–11, *reprinted in* 1980 U.S.Code Cong. & Ad.News 4953, 4984, 4989.

12. *Gava v. United States,* 699 F.2d 1367, 1370 (Fed.Cir.1983); *Goldhaber v. Foley,* 698 F.2d 193, 196 (3d Cir.1983); *Broad Avenue Laundry & Tailoring v. United States,* 693 F.2d 1387, 1390–91 (Fed.Cir.1982).

13. *Gava v. United States,* 699 F.2d at 1371; *Broad Avenue Laundry & Tailoring v. United States,* 693 F.2d at 1390–91.

14. *Ellis v. United States,* 711 F.2d at 1576; *Goldhaber v. Foley,* 698 F.2d at 196–97.

In pretrial preparation both parties identified disputed questions of fact on liability issues to be tried. Defendant maintained that cancellation of the contract on environmental grounds was justified and any damage recovery by plaintiff was precluded. Defendant's counsel, however, agreed with plaintiff that all liability matters could be disposed of on the basis of documentary evidence. The question of the need to prepare and present evidence on liability issues was not resolved until the first day of trial, on February 7, 1978.[15] Plaintiff at that time withdrew any challenge to factual support for the Forest Service's conclusion that the timber sale cancellation was motivated by environmental concerns. Plaintiff accepted the proposition that the Forest Service motivation to unilaterally cancel the contract was unstable soil conditions caused by road construction and logging. Defendant agreed that the ARM sale contract did not provide for cancellation on environmental grounds.[16]

Nonetheless, defendant throughout the trial continued to refuse to concede liability.[17]

15. A letter to counsel dated July 15, 1976, reflects the status of this issue after a pretrial conference:

"1. *Liability:* On the issue of liability, defendant maintains that cancellation of plaintiff's contract ('Arm Timber Sale' Contract, No. 01068–1) on October 17, 1973, effective November 9, 1973, was justified because based on environmental grounds and thus serves to preclude any damage recovery by plaintiff as a result of said cancellation. Plaintiff maintains that the cancellation of the contract, regardless of the reasons therefor, entitles plaintiff to a damage recovery. While both parties in their pretrial submissions on liability stated that a trial on liability was not necessary, it seems clear that such a liability trial is required unless plaintiff decides not to challenge the validity of the environmental grounds advanced by defendant as justification for the cancellation. If plaintiff decides not to contest the environmental basis grounds, then a liability determination would seem to rest on a legal determination of whether cancellation of a contract on environmental grounds, under circumstances of this particular contract, precludes the award of damages for such a breach of contract. Under this analysis, a trial on the liability question may not be necessary. Plaintiff has agreed to advise the trial judge, and opposing counsel, after completion of appropriate discovery, whether it intends to put in issue the validity of the environmental grounds advanced by defendant in justification of the cancellation in light of its position that the reasons for the breach of contract are immaterial to its right to recover damages relative to said breach. The burden of advising me whether or not trial on the liability issue will be necessary is hereby placed on plaintiff's counsel."

16. The following colloquy occurred (Transcript at pages 27–28):

"THE COURT: Does the contract provide a statement which would permit consideration of that motive as a limitation of liability?

"MR. LENIHAN: No.

"THE COURT: Would defendant agree to that?

"MR. KOSKINEN: The contract that is written does not, no. The Court will have to take notice of the environmental furor in which we live.

"MR. LENIHAN: I might also inform the Court that the Code of Federal Regulations of the Secretary of Agriculture establishing the grounds for cancellation does not recognize cancellation motivated by environmental reasons at the time the contract was entered into. And it wasn't until August of 1973 that the Secretary of Agriculture promulgated new regulations permitting the cancellation of the arm sale contract for environmental reasons. Before that time there were no regulations dealing with it.

"The Forest Service Manual, which is the Chief of the Forest Service's interpretation of those regulations also is silent as to the right to cancel for anything other than breach both before and after, and the manual statements of Forest Service policy acknowledge that any unilateral cancellation of a contract, except for a breach by the purchaser, is a breach by the United States.

"THE COURT: Does defendant have a comment?

"MR. KOSKINEN: I am not familiar with the regulations."

17. In this regard, the following exchange occurred (transcript at 29):

"THE COURT: Is it defendant's position that the environmental considerations serves as a limitation on the liability under the contract?

"MR. KOSKINEN: Your Honor, I wish to reserve my position on that because we are getting decisions and regulations and orders and statutes down every day.

"THE COURT: None of them pertain to 1973 actions, do they?

"MR. KOSKINEN: Well, I don't know about a decision. A decision might. I think it is possible that—well, let me put it, Your Honor, eventually, whether in 1973 or not it was so, eventually Government contracts will contain a clause permitting cancellation for environmen-

Defendant made no effort to meet or rebut plaintiff's evidence. Testimony was concerned with factual matters relative to damages only. Defendant called no witnesses and presented no evidence on liability issues; defendant called one witness, whose testimony was limited to Forest Service appraisal procedures. Defendant's posttrial briefing did not address the question of liability to plaintiff; it was concerned solely with matters related to damages. In short from the inception of plaintiff's case in the Court of Claims to the December 28, 1979, opinion of the trial judge, defendant presented no defense. The litigating posture of the United States was merely to put plaintiff to its proof. No effort was made to meet or rebut plaintiff's case.

■ On the basis of the record in pretrial, at trial, and in posttrial briefing, defendant's litigating posture during the trial period was unreasonable. Substantial justification for the defendant's actions during the trial period has not been shown.

■ In the light of defendant's refusal to concede liability while presenting no defense, and from independent consideration of the record, the trial judge sua sponte invoked the doctrine of frustration of purpose. Defendant was found not to have breached the contract because the contractual obligation had become incapable of being performed without rendering performance radically different and worthless to the Government. This argument had not been presented by either party. When the Appellate Division reviewed plaintiff's exceptions to the findings and conclusion of the trial judge, defendant supported application of the doctrine of frustration of contract purpose. In addition, defendant advanced a new argument that had not been presented to the trial judge. This argument was that cancellation of the contract to protect the environment was in the na-

ture of a sovereign act, akin to the operation of a public dam for the public good. The Court of Claims rejected both the frustration of purpose and sovereign act arguments.

Defendant's litigating posture during the appeal period was reasonable. Accordingly, defendant's position was substantially justified, and plaintiff is not entitled to recover under the EAJA during this period.

■ In its May 20, 1981, decision, the Court of Claims determined that plaintiff was entitled to recover compensable costs and breach damages by the formula in 36 C.F.R. § 223.9(a)(5) (1980). This formula for computation of claims on cancellation for environmental reasons had been promulgated in 1977, and utilized thereafter with respect to Forest Service contracts when applicable. Notwithstanding administrative experience with the policy and procedures involved in application of this formula, negotiations for a settlement of plaintiff's damages were extended for an unreasonable period.

After the July 10, 1981, denial of plaintiff's motion for clarification and/or amendment of the May 20, 1981, decision, counsel were directed, on July 13, 1981, to confer and to report (on or before August 14, 1981) the status of their efforts to stipulate or otherwise agree upon the amounts to be recovered by plaintiff. After a series of time extensions, plaintiff's statement on damages for its claims was presented to defendant on December 10, 1981.

On March 11, 1982, defendant reported that a final report on plaintiff's submission was expected from the Forest Service within 30 days. The Forest Service report was submitted to plaintiff on April 29, 1982.

On June 8, 1982, counsel were ordered to file a report by June 18, 1982, on the status of consideration of the computation of the amount to be recovered by plaintiff. Plaintiff submitted a report on June 18, 1982.

tal reasons. And I suppose when and if we adopt such a clause it will be in the nature of a termination for convenience clause.

"Now, we are going to get there sometime. Whether or not we were there at the time that this contract was cancelled, I think the Court will have to decide.

"So, I refuse to concede now that there is no merit to this defense."

Defendant did not respond, and on June 28, 1982, defendant was ordered to file a statement on or before July 16, 1982, that either "accepts or rejects with reasons therefor" the items in plaintiff's statement. Defendant filed a number of motions for enlargement of time, the last of which was denied on July 27, 1982. Defendant filed its response to the June 28, 1982, order on August 6, 1982. By orders dated August 31, 1982, September 23, 1982, and December 3, 1982, counsel were encouraged to negotiate.[18]

On February 11, 1983, plaintiff submitted an offer in compromise. On April 8, 1983, counsel were directed to file a status report; on April 26, 1983, defendant advised that the offer in compromise had been accepted; and, pursuant to stipulation, judgment for plaintiff was entered on May 16, 1983, for $370,000.

During the damages period, negotiations between counsel were unreasonably protracted, with most of the delay the responsibility of defendant. Defendant's litigating posture during this period was not substantially justified.

 Attorney fees authorized to be compensated by the EAJA are to be "reasonable." The Act does not define the term "reasonable," but the amount awarded is to be based upon "prevailing market rates for the kind and quality of services furnished" and attorney fees may not exceed $75 per hour unless the court determines that a higher rate is justified. In its consideration of awards for attorney fees, the Court of Claims endorsed a fee standard that derived generally from the factors set forth in the American Bar Association Code of Professional Responsibility, DR 2–106(B).[19] These factors, with minor variations, have been applied with respect to attorney fees authorized in other statutes.[20]

 The weight to be given to the respective factors varies with the requirements of the particular case. Of primary importance, however, is a consideration of the number of hours reasonably expended,

---

**18.** The Dec. 3, 1982, order directed counsel to file on or before Feb. 15, 1983, a joint statement that:

"(a) reports the status of negotiations toward settlement, and (b) lists all outstanding unresolved issues for which additional evidentiary proceedings are required."

**19.** *Cherokee Nation v. United States,* 355 F.2d 945, 953–54, 174 Ct.Cl. 131 (1966). The following factors were listed as criteria generally considered in awarding compensation to attorneys:

"(1) The nature of the undertaking and the character of the services required.

"(2) The responsibility assumed.

"(3) The professional repute, standing, ability and experience of counsel.

"(4) The services rendered, including the time and labor required.

"(5) The magnitude and importance of the cases.

"(6) The novelty and difficulty of the questions involved.

"(7) The opposition encountered.

"(8) The results accomplished and the benefits flowing to the clients.

"(9) The professional competence displayed, including skill, industry, and diligence.

"(10) The fidelity of counsel to the interests of their clients.

"(11) The contingent nature of the employment and the hazards and risks involved.

"(12) The loss of income and opportunities for other employment due to employment of counsel in the litigation for which compensation is to be awarded.

"(13) Customary charges and going rates of attorneys for similar services. * * * "

**20.** In the determination of a reasonable attorney fee under Title VII of the Civil Rights Act of 1964, (42 U.S.C. § 2000e–5(k)), the Fifth Circuit utilized a 12 point analysis with the following factors:

"... (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment; (5) the customary fee in the community for similar work; (6) the fixed or contingent nature of the fee; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the resulted obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases."

*Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974). *See also Copeland v. Marshall,* 641 F.2d 880 (D.C.Cir. 1980); *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67 (9th Cir.1975), *cert. denied sub nom. Perkins v. Screen Extras Guild, Inc.,* 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976).

and the hourly rate that is reasonable and customary in the community for the type of work involved.[21] In the consideration of plaintiff's application in this case, particular emphasis is given to the rates the parties agreed upon, and to the circumstance that under the prevailing rate structure in the local community, comparable services were compensated at the rates charged by plaintiff. The rates set forth in plaintiff's application are commensurate with rates charged in the area of Seattle, Washington by lawyers with comparable or equivalent skills, training and experience.

Plaintiff's application asks for payment of $95,018 for attorney fees for a total of 1,316.3 hours of work during the period June 1975 through June 1983. This represents, overall, an average hourly rate of $72.19.

▆ It is not permissible to compute charges over the entire period so as to arrive at the average rate that is below the $75 per hour maximum. The EAJA does not authorize compensation at an hourly rate in excess of the rate that actually was charged for particular hours. To average the rate over the entire period, as reflected in plaintiff's application, would result in a compensation for some hours at a rate higher than the rate actually paid for those hours. During the period covered by the application, 8.1 hours were billed at $140 per hour. This and other charges over the $75 per hour maximum are not allowable and must be adjusted.

Adjustments have been made to permit reimbursement at the rate billed when the rate was $75 per hour or less. Hours billed at rates in excess of $75 per hour were reduced to that amount.

▆ The EAJA provides that the $75 per hour maximum may be exceeded when the court determines that an increase in the cost of living or a special factor, such as the limited availability of qualified attorneys for the proceedings involved, justifies a

higher fee. The record in this case does not provide a basis for a determination on either basis. Plaintiff asserts that its principal attorney is "one of about 10 lawyers in the United States with extensive experience in litigating over Forest Service and other public timber sale contracts." Counsel's specialization and ability are not questioned. Timber sale contracts, however, have been a part of Forest Service routines for many years, and no shortage of qualified attorneys for such proceedings has been shown, or is apparent.

Plaintiff's application sets forth amounts invoiced to Everett Plywood Corporation for legal services in connection with this case, for each year, in the period June 1975 through June 10, 1983. Support for these billings is provided by an itemized summary, by daily entry, of the legal services provided on that date. These calendar entries are supported by time slips that set forth the date, the services rendered, and the attorney doing the work. The invoices are further supported in the application by a summary, by year, of the total fees billed, segregated by hours and hourly rates of each lawyer rendering services.

Invoices billed to plaintiff for legal services in connection with this case total $95,018, and are summarized as follows:

INVOICES

| Year | Amount |
|---|---|
| 1975 | $ 3,975.00 |
| 1976 | 4,835.00 |
| 1977 | 9,395.00 |
| 1978 | 25,360.00 |
| 1979 | 10,785.00 |
| 1980 | 28,270.00 |
| 1981 | 4,705.00 |
| 1982 | 3,650.00 |
| 1983 (to 6/10/83) | 4,043.00 |
| | $ 95,018.00 |

During the course of this litigation, the hourly rates for the principal attorney varied from $60 to $140, and hourly rates for associates ranged from $50 to $115. Different hourly rates were used in each year, dependent upon the particular work involved. Generally, over the course of the litigation period, there was a gradual increase in hourly rates. During period No. I

---

**21.** In the District of Columbia Circuit, this is termed the "lodestar" formula. *Copeland v.* *Marshall,* 641 F.2d at 891.

(the trial period), rates for the principal attorney and the associate varied from $50 to $85; during period no. II (the appeal period), the rates varied from $65 to $100, and during the period No. III (the damages period), the rates varied from $65 to $140. Rates charged during the course of this litigation were as follows:

HOURLY RATES

| | PRINCIPAL ATTORNEY | ASSOCIATES |
|---|---|---|
| 1975 | $60;$80 | $50;$55;$60 |
| 1976 | $65;$75;$80 | $50;$55 |
| 1977 | $65;$75 | $55;$65 |
| 1978 | $75 | $55;$60;$65 |
| 1979 | $75;$85 | $65;$75 |
| 1980 | $85;$95 | $65;$70;$75 |
| 1981 | $85;$100 | $70;$75;$85 |
| 1982 | $100;$125 | $65;$75 |
| 1983 | $125;$140 | $95;$115 |

The following table sets forth the applicable rates, the hours provided, the total charge at the hourly rate and the total entitlement after adjustment to reduce the rate to the $75 maximum for those hours subject to the maximum.

Period No. I – Trial Period

| Rate | Hours | Total | Adjusted to $75 max. |
|---|---|---|---|
| $50 | 1.3 | $ 65.00 | |
| $55 | 234.0 | 12,870.00 | |
| $60 | 42.2 | 2,532.00 | |
| $65 | 238.3 | 15,489.50 | |
| $75 | 251.3 | 18,847.80 | |
| $80 | 59.2 | 4,736.00 | $ 4,440.00 |
| $85 | 1.4 | 119.00 | 105.00 |
| Total | 827.7 | $ 54,659.30 | $ 54,349.30 |

Period No. II – Appeal Period

| Rate | Hours | Total | Adjusted to $75 max. |
|---|---|---|---|
| $65 | 125.9 | $ 8,183.50 | |
| $70 | 20.3 | 1,421.00 | |
| $75 | 15.8 | 1,185.00 | |
| $85 | 220.3 | 18,725.50 | $ 16,522.50 |
| $95 | 1.0 | 95.00 | 75.00 |
| $100 | 9.55 | 955.00 | 716.25 |
| Total | 392.85 | $ 30,565.00 | $ 28,103.25 |

Period No. III – Damages Period

| Rate | Hours | Total | Adjusted to $75 max. |
|---|---|---|---|
| $65 | 0.3 | $ .19.50 | |
| $70 | 1.8 | 126.00 | |
| $75 | 15.8 | 1,192.50 | |
| $85 | 6.6 | 561.00 | $ 495.00 |
| $95 | 20.9 | 1,985.50 | 1,567.50 |
| $100 | 10.05 | 1,005.00 | 753.75 |
| $115 | 0.5 | 57.50 | 37.50 |
| $125 | 31.7 | 3,962.50 | 2,377.50 |
| $140 | 8.1 | 1,134.00 | 607.50 |
| Total | 95.75 | $ 10,043.50 | $ 7,176.75 |

For attorney fees, plaintiff is entitled to an award of the adjusted totals for periods I and III.

Plaintiff's application contains an analysis of charges paid for consultants and engineering work. These charges were paid to plaintiff's consultants, Mason, Bruce & Girard, Inc., in connection with the ARM timber sale during 1974 to 1982. The services included a field evaluation of ARM timber, related engineering services, and written reports and testimony.

Defendant argues that plaintiff is not entitled to these expenses because they were waived in paragraph 4 of the stipulation for entry of judgment.

Charges for consultants and engineering work are summarized as follows:

| Consultants and Engineering Work | |
|---|---|
| 1974 | $ 2,710.51 |
| 1977 | 924.90 |
| 1978 | 1,139.52 |
| 1981 | 1,393.67 |
| 1982 | 1,232.50 |
| | $ 7,401.00 |

Payments made by plaintiff during 1974 in connection with the ARM timber sale are not eligible costs under the EAJA. They were incurred prior to the institution of this case on June 12, 1975. The remainder of the expenses clearly were waived by the terms of paragraph 4 of the stipulation, which plaintiff signed in May 1983. The stipulated amount of $370,000 was for full satisfaction of all claims, including "all claims for costs, expenses, and damages of any kind."

Plaintiff cites a letter dated February 11, 1983, to support its contention that there never was any discussion or agreement to forego a claim for costs and expenses. Paragraph 4 of the stipulation is clear; no ambiguity exists. There is no reason to go behind its terms in an attempt to divine the parties' intentions at an earlier stage of the negotiations. Similarly, plaintiff's claim for costs and related expenses in the amount of $3,284.42 has been satisfied and is not compensable under the EAJA.

The total amount of attorney fees and expenses for which plaintiff seeks reim-

bursement, and the amounts to be awarded are as follows:

SUMMARY

| | Requested | Allowed |
|---|---|---|
| Attorney Fees | $ 95,018.00 | $ 61,526.05 * |
| Consultants & Eng. Work | 7,401.10 | – – – |
| Costs & Related Expenses | 3,284.42 | – – – |
| | $105,703.52 | $ 61,526.05 |

* For Period Nos. I and III

## CONCLUSION

For the reasons set forth in this opinion, plaintiff is the prevailing party in this case and is entitled to an award pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), of $61,526.05 for attorney fees incurred during the trial period and the damages period of this case. Judgment will be entered in that amount.