Joseph **SERAVALLI, et al., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

No. 639–84–C.

United States Claims Court.

March 8, 1989.

J. Daniel Sagarin, Hurwitz & Sagarin, P.C., Milford, Conn., for plaintiffs.

J. Keith Burt, with whom were Asst. Atty. Gen. Richard K. Willard, David M. Cohen and M. Susan Burnett, Washington, D.C., for defendant.

## OPINION and ORDER

TURNER, Judge.

The Seravalli brothers, Joseph and John, Jr., as sole stockholders of the Brookchester Corporation, have applied under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d), for attorneys' fees and other expenses incurred in their successful contract action against the United States. For reasons set forth below, it is concluded that plaintiffs are not entitled to an EAJA award for their efforts in this litigation.

I

The underlying action for which plaintiffs now seek EAJA monies was a contract suit in which plaintiffs successfully challenged defendant's failure to close on its contract for the sale of an apartment complex in New Haven, Connecticut. The Seravallis entered into the contract with the Department of Housing and Urban Development (HUD) on March 7, 1984. The parties set an initial closing date of April 6, 1984. However, due to HUD's unilateral termination of the contract, closing did not occur. Instead, HUD sold the property to another buyer, whereupon the Seravallis brought this civil action.

Resolution of the issues raised by the instant EAJA application requires a detailed appreciation of the history of this litigation. On February 21, 1984, two weeks before the parties entered into the contract, the Seravallis sent HUD a letter that stated:

[B]oth Joseph and John Seravalli, Jr. have a conviction for conspiracy to commit arson in the second degree from an alleged incident from 1974. This took place at a time when we were both 20 years old. We have since then done business with HUD several times.[1]

After HUD signed the contract, but prior to the agreed date of closing, HUD received a letter from Mayor Biagio DiLieto of New Haven in which the mayor expressed his

deep concern over the proposed sale [of HUD property] to a corporation whose principals are John and Joseph Seravalli, [because] these two individuals were convicted and sentenced for ... arson in 1983 ... [and] it is difficult to imagine a

crime which would trigger [HUD's right to disapprove a sale] under [24 C.F.R. § 200.230(c)(7) (1984)] if arson does not.[2]

Several weeks later, after having confirmed that the conviction date was indeed 1983, HUD initiated proceedings to debar the Seravalli brothers and their affiliates from further participation in HUD programs and suspended them from such participation pending the debarment proceedings' outcome.[3] Shortly thereafter, HUD unilaterally terminated the contract, citing the suspension and a provision of the contract that stated, "Purchaser may not be currently suspended ... from participating in HUD programs."[4] In October 1984, HUD sold the property to another buyer at a price substantially higher than that which the Seravallis had contracted to pay.

The Seravallis filed suit in this court in December 1984 (amending their complaint in January 1985), seeking, *inter alia*, specific performance of the contract as well as damages reflecting the difference between the contract price and the fair market value of the property on the date of closing. This court (Seto, J.) granted defendant's motion to dismiss the specific performance count on February 4, 1985. Meanwhile, the Seravallis contested their suspension and proposed debarment before HUD's Board of Contract Appeals (HUDBCA or Board).

On May 30, 1985, the Board handed down its decision, denying the government's requested debarment of the Seravalli brothers and their affiliates and terminating their suspension.[5] The Board observed that neither the government nor the record revealed anything about "the underlying circumstances of events" which gave rise

1. Letter dated 21 February 1984 from Joseph and John Seravalli, Jr. to HUD's department of Multifamily Property Disposition (Defendant's Trial Exhibit 8).

2. Letter dated 2 April 1984 from Mayor DiLieto of New Haven to Maurice Barksdale, Assistant Secretary, Multi-Family Housing Programs, HUD (Exhibit 6, plaintiffs' pre-trial submission).

3. Letter dated 1 June 1984 from Maurice Barksdale to John Seravalli, Jr. (Exhibit 9, plaintiffs' pre-trial submission).

4. Letter dated 18 June 1984 from Maurice Barksdale to Joseph and John Seravalli, Jr. (Exhibit 12, plaintiffs' pre-trial submission).

5. *Matter of John Seravalli, Jr. et al.,* HUDBCA Nos. 84–880–D37, 84–881–D38, 84–952–DB and 84–953–DB (HUDBCA May 30, 1985) [1985 WL 17604] (Exhibit 13, plaintiffs' pre-trial submission).

to the convictions.[6] It therefore found no reason to question Joseph Seravalli's affidavit which described these circumstances: the brothers were charged in November 1977 with crimes relating to a fire which had occurred in 1974 in a vacant building which the brothers then owned; a 1980 trial ended in a hung jury and, following a 1983 decision of Connecticut's highest court that the Constitution's double jeopardy clause would not bar their re-trial, the brothers entered a plea under *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (a guilty plea which contains a protestation of innocence). The Board concluded that the convictions simply did not provide a basis for finding a *present* lack of responsibility. 24 C.F.R. § 24.6(a)(9) (1984). Instead, it found persuasive the "substantial diverse and credible evidence, much of it supported by affidavit, of present responsibility of [the Seravallis] as owners and managers of residential property."[7]

Soon after HUDBCA's decision was rendered, plaintiffs filed a motion for partial summary judgment in their Claims Court action, urging that, under principles of *res judicata*, the Board's ruling had the effect of establishing defendant's liability for terminating the contract. The government disagreed, contending that the issues before HUDBCA and the Claims Court were not sufficiently similar to allow invocation of the *res judicata* doctrine. Nevertheless, on March 26, 1986, defendant conceded liability.[8]

The period between the Board's decision (May 30, 1985) and defendant's concession of liability (March 26, 1986) was almost a full ten months. During this time, the parties filed pre-trial submissions, engaged in discovery, and conducted settlement negotiations. In addition, two status conferences were held. During the first of these conferences, held February 13, 1986, plaintiffs' counsel stated that, although he intended to depose several witnesses on the liability issue, the possibility of a breakthrough in settlement discussions had caused him to postpone taking any of these depositions. (Transcript of 2/13/86 status conference at 8–9). And at the status conference held on the day defendant conceded liability, the remarks of plaintiffs' counsel indicated that most if not all of plaintiffs' depositions were yet to be taken. (*See* transcript of 3/26/86 status conference at 6).

In September 1986, a four-day trial was held solely on damages issues. At trial, the government proposed that damages be calculated using the "comparable sales" method; it did not succeed in this effort. *Seravalli v. United States*, No. 639–84C (Cl.Ct.1987), *affirmed*, 845 F.2d 1571 (Fed. Cir.1988). Judgment was entered in favor of the Seravallis in the amount of $203,740 on June 19, 1987. Having prevailed on the merits, the Seravallis instituted the instant EAJA application.

Meanwhile, defendant appealed the decision on the merits to the Federal Circuit which affirmed the trial court's rejection of defendant's proposed damages calculation formula. *Seravalli v. United States*, 845 F.2d 1571 (Fed.Cir.1988). Having again prevailed, the Seravallis then applied to the Federal Circuit under EAJA for the attorney fees and expenses they had incurred contesting defendant's appeal. The Federal Circuit denied plaintiffs' application, finding that defendant's position on damages was substantially justified. *Seravalli v. United States*, No. 87–1566 (Fed.Cir. June 29, 1988).

---

6. *Matter of Seravalli*, note 5, *supra*, Exhibit 13 at 5.

7. *Matter of Seravalli*, note 5, *supra*, Exhibit 13 at 5.

8. This is the date stated by plaintiffs in their Reply; it therefore indicates that plaintiffs ceased work on the liability issues on that date and will serve, for purposes of this application, as the date liability was conceded. Actually, the record shows that although defendant's counsel stated her intention to concede liability at a status conference on March 26, 1986, she conditioned the concession on whether approval could be secured from the appropriate Justice Department official. (Transcript of 3/26/86 status conference at 3). At a status conference on Tuesday, May 6, 1986, defense counsel stated that she had secured that approval "on Friday." (Transcript of 5/6/86 status conference at 3).

## II

In their application, the Seravallis contend that defendant's position in this dispute, both at the agency level and in litigation before this court, was not "substantially justified." 28 U.S.C. § 2412(d)(1)(A). Plaintiffs urge that, because they had revealed their arson convictions to defendant prior to the contract's formation, defendant behaved unreasonably when it later relied on those same convictions in terminating the contract. Further, plaintiffs assert that the government was not justified in waiting one year and three months after the filing of the amended complaint, and ten months after HUDBCA's decision, before conceding liability. Finally, the Seravallis raise a number of points regarding defendant's position on damages and assert that, as to each, defendant was not substantially justified. They seek recovery of $36,986.84 in attorney fees and other expenses.

In its Opposition, the government contends that its position was reasonable. Defendant notes that it did concede liability and urges that the Seravallis have failed to show harm from defendant's allegedly unfounded delay in making this concession. The government also defends its position on damages, and it argues (in a July 12, 1988 supplement to its Opposition) that the Federal Circuit's denial, on substantial justification grounds, of plaintiffs' application for EAJA monies arising from their appellate efforts has the effect of establishing that defendant's position before this court, too, was substantially justified.

## III

The EAJA provides:

[A] court shall award to a prevailing party other than the United States fees and other expenses ... incurred by that party in any civil action ... brought by or against the United States ... unless the court finds that the position of the United States was substantially justified or that special circumstances would make an award unjust.

28 U.S.C. § 2412(d)(1)(A). In the case at bar, the parties' dispute is confined to the question whether defendant's position was "substantially justified." *Id.* The Supreme Court has recently held that to meet this standard, the government must demonstrate that its position was " 'justified in substance or in the main,' that is, justified to a degree that could satisfy a reasonable person [, which] is no different from [showing that its position had a] 'reasonable basis both in law and fact.' " *Pierce v. Underwood*, —— U.S. ——, 108 S.Ct. 2541, 2550, 101 L.Ed.2d 490 (1988). When determining whether a "reasonable basis both in law and fact" has been shown, *Id.*, a court must consider "all the pertinent facts of the case," *Broad Avenue Laundry & Tailoring v. United States*, 693 F.2d 1387, 1391 (Fed.Cir.1982), in light of "the law as it existed when the government was litigating the case." *Kay Manufacturing Co. v. United States*, 699 F.2d 1376, 1379 (Fed. Cir.1983).

### A

■ This court agrees with defendant that the Federal Circuit's denial of plaintiffs' other EAJA application influences the instant disposition. Under the doctrine of law of the case, it is the practice of courts generally to refuse to reopen what has been decided, because no litigant deserves an opportunity to go over the same ground twice. *Gindes v. United States*, 740 F.2d 947, 949 (Fed.Cir.), *cert. denied*, 469 U.S. 1074, 105 S.Ct. 569, 83 L.Ed.2d 509 (1984). Here, law of the case, not *res judicata*, is the appropriate doctrine to consult since plaintiffs' EAJA application to the Federal Circuit "was but a further step in the litigation of the same case." *J.E.T.S., Inc. v. United States*, 838 F.2d 1196, 1199–1200 (Fed.Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 2825, 100 L.Ed.2d 926 (1988). In plaintiffs' Federal Circuit application, the issue was whether defendant's damages position on appeal was "substantially justified." 28 U.S.C. § 2412(d)(1)(A). Defendant had advanced the same damages theory on appeal as it had at trial. The Federal Circuit found defendant's advocacy of that theory to have passed substantial justification muster. *Seravalli v. United States*, No. 87–1566 (Fed.Cir. June 29, 1988).

Thus, were this court to undertake its own assessment of the reasonableness of defendant's damages position at trial, it would be permitting plaintiffs to "go over the same ground twice" in contravention of the law of the case doctrine. *Gindes v. United States*, 740 F.2d at 949. Accordingly, consideration of the instant application shall be limited to evaluation of defendant's position on liability.

### B

■ In assessing the justifiability of defendant's liability position, the first question is whether defendant behaved reasonably when it terminated the contract.[9] Careful examination of the record, in light of the HUD regulations in force at the time and the contract itself, has persuaded that defendant's termination of the contract "was justified to a degree that [could] have satisf[ied] a reasonable person." *Pierce v. Underwood*, 108 S.Ct. at 2550.

While it is true that plaintiffs notified HUD of their convictions before HUD executed the contract, the notification was misleading. The Seravallis' letter implied that (1) their convictions occurred in 1974 and (2) they had been approved for HUD work after having been convicted. Neither implication proved true. So when Mayor DiLieto's alarming letter caused HUD to look into the matter, HUD's investigation could only have lent credence to the mayor's concerns. Not only were the Seravallis' convictions as recent as the mayor suggested, but the Seravallis had been less than candid in characterizing the convictions' temporal relationship to other HUD contracts awarded to them. Further, defendant could not have easily learned the mitigating circumstances later found by the Board since (as HUDBCA later observed) the

record of the convictions revealed nothing of their underlying facts. Instead, at the time it acted to terminate the contract, HUD could reasonably have been aware only that its 1984 contract for the sale of New Haven apartments was with a corporation whose principals had (1) been convicted of conspiracy to commit arson (2) only a year earlier (3) in New Haven and who (4) had misled HUD about the date of those convictions, (5) had inaccurately implied having received approval for HUD work after having been convicted, and (6) whose trustworthiness was questioned by New Haven's mayor.

Faced with these worrisome facts, conscious of its codified responsibility to protect those who relied on it to furnish "a suitable living environment," 24 C.F.R. § 24.0 (1984), and mindful that it possessed authority to terminate a contract based on "the best interest of the Government," 24 C.F.R. § 24.5(e) (1984), HUD terminated the contract. Careful review of the record has persuaded that HUD took this step only after deliberations that were both "legally sound and factually sensitive." *Cherry v. United States*, 4 Cl.Ct. 20, 23 (1983). Further, because language in the contract arguably provided independent additional ground for the contract's termination, HUD's termination of the contract cannot be deemed lacking in substantial justification.[10]

### C

There remains only the need to assess the reasonableness of defendant's fifteen-month delay in conceding liability (measured from the January 1985 filing of the amended complaint to the March 1986 concession). Certainly the government was

---

9. As a result of Congress' 1985 amendment of EAJA, the government is now charged with justifying not only its litigation position, but also its agency-level actions. 28 U.S.C. § 2412(d)(2)(D).

10. Plaintiffs have previously challenged, under a different standard, the reasonableness of defendant's actions in terminating the contract. Their unsuccessful effort in this regard consisted of an attempt at trial to recover bid preparation costs. In order to have recovered such

sums, plaintiffs had to establish that the government's actions in terminating the contract were "arbitrary and capricious." *Keco Industries, Inc. v. United States*, 203 Ct.Cl. 566, 574, 492 F.2d 1200, 1203 (1974). Judge Seto concluded that defendant's termination of the contract was neither arbitrary nor capricious and denied bid preparation costs. *Seravalli v. United States*, No. 639–84C (Cl.Ct. June 19, 1987), *affirmed*, 845 F.2d 1571 (Fed.Cir.1988).

justified in awaiting Judge Seto's February 1985 ruling on its motion for partial dismissal. Nor could defendant be faulted for awaiting HUDBCA's May 30, 1985 decision in the debarment proceeding. And pertinent regulation provided defendant ten working days from its receipt of the Board's decision in which to request an appeal. 24 C.F.R. § 24.8(b) (1985). This leaves a period of roughly nine and one-half months for which it must be determined whether defendant's failure to concede liability can be equated with the assumption of a litigating position lacking in substantial justification.

■ As an initial matter, it is important to note that the mere passage of time between the advent of a case posture with respect to which the government eventually concedes liability and the date of that concession does not, standing alone, amount to unjustified government delay. *Bailey v. United States,* 721 F.2d 357 (Fed. Cir.1983); *Ashburn v. United States,* 740 F.2d 843 (11th Cir.1984). In *Bailey,* a successful litigant sought an EAJA award based on the twenty-two month delay between the filing of his complaint and defendant's stipulation for entry of judgment. 721 F.2d at 359. Declining plaintiff's invitation to base an award of fees on the fact of a twenty-two month delay alone, the Federal Circuit remanded the case for determination of the reasons for the delay. 721 F.2d at 361. Similarly, in *Ashburn,* the Eleventh Circuit reversed an EAJA award whose sole basis was the passage of eleven months between the filing of the complaint and the government's concession of liability. 740 F.2d at 850. It therefore follows that the mere existence of a nine and one-half month time gap in the instant case does not alone entitle plaintiffs to an EAJA award.

■ Instead, the cases suggest adoption of a three-pronged approach to an EAJA "delay case." First, a court needs to determine whether the government bears greater responsibility for the delay. *Compare Everett Plywood Corp. v. United States,* 3 Cl.Ct. 705, 712 (1983) (EAJA monies awarded where settlement negotiations "were un-

reasonably protracted, with most of the delay the responsibility of defendant") *with Alger v. United States,* 3 Cl.Ct. 246, 249 (1983), *affirmed,* 741 F.2d 391 (Fed.Cir. 1984) (no EAJA award where "delays were attributable to plaintiffs"). Should the government be found responsible, a court must next consider whether the delay has nevertheless been reasonably explained. *See Bailey v. United States,* 721 F.2d at 361 (remanding case for determination of reasons for delay); *compare Environmental Defense Fund, Inc. v. Watt,* 722 F.2d 1081, 1086 (2d Cir.1983) (fees warranted where government "made no effort" to explain its "protracti[on of] settlement negotiations") *and Ward v. Schweiker,* 562 F.Supp. 1173, 1180 (W.D.Mo.1983) (fees awarded where neither defendant nor record explained the delay in achieving stipulated settlement identical to that reached in an earlier case) *with Ashburn v. United States,* 740 F.2d at 850 (no fees awarded where defendant's delay explained as time reasonably required to obtain and review pertinent files) and *Spinks v. United States,* 4 Cl.Ct. 723, 726 (1984) (no fee award where thirteen-month delay resulted from defendant's referral of matter to administrative process). Finally, a court must ask whether the EAJA applicant was harmed by the delay. *See Ashburn v. United States,* 740 F.2d at 851 (even assuming eleven-month delay was attributable to unreasonable government behavior, no EAJA entitlement because "[p]laintiffs' attorneys spent only 2.2 hours on the case during this time"). Requiring a showing of harm is consonant with the legislative intent to charge the United States only with such portion of the fees and expenses as is attributable to its unjustifiable positions where circumstances so permit. *See Goldhaber v. Foley,* 698 F.2d 193, 197 (3rd Cir.1983); *accord, Ellis v. United States,* 711 F.2d 1571, 1576 (Fed.Cir.1983).

■ In the instant case, the record is insufficient to support a conclusion that the nine and one-half month delay was solely the responsibility of defendant. Nor could it be found with any certainty that defendant's behavior during this period was un-

reasonable. As noted above, the record indicates that the parties filed their pre-trial submissions and engaged in discovery and settlement negotiations during the "delay." It may well have been that information revealed for the first time in discovery persuaded defendant to concede liability. And certainly the government should not be penalized for having entered into settlement negotiations. But most significantly, plaintiffs' application fails to show that plaintiffs were harmed by the delay. Inadequate itemization of plaintiffs' fees and other expenses makes it impossible to tell either (1) when in the course of the litigation particular attorney fees were incurred or (2) which fees were incurred for work on damages issues (not compensable in view of the Federal Circuit's ruling) and which fees were incurred for efforts related to liability.[11] The transcripts of status conferences held just prior to defendant's concession of liability indicate that plaintiffs conserved at least some of their energies with regard to liability questions in the belief that a government concession was forthcoming. It is therefore concluded that plaintiffs are not entitled to an EAJA award based on the pre-concession delay.[12]

## IV

Plaintiffs' application is DENIED. Judgment shall be entered accordingly.

---

[11] The EAJA requires that anyone seeking an award of attorneys' fees and expenses submit "an itemized statement ... stating the actual time expended and the rate at which fees ... were computed." 28 U.S.C. § 2412(d)(1)(B). The "itemized statement" must be sufficiently detailed to show "specific task[s] performed." *Naporano Iron and Metal Co. v. United States,* 825 F.2d 403 (Fed.Cir.1987). In the instant case, plaintiffs seek fees for attorney work performed from "12/4/84 through 7/6/87" without providing any chronological or descriptive breakdown that might have revealed the fees attributable to liability issues that were incurred during the period of allegedly unjustified delay. Accordingly, plaintiffs' application could have been dismissed on grounds of inadequate itemization alone. *Id.*

[12] Even if plaintiffs were otherwise entitled to an EAJA award, their application lacks a net worth affidavit for the Brookchester Corporation, named party to the contract in the underlying litigation, as required by 28 U.S.C. § 2412(d)(2)(B)(ii).